**Bruce E. VOID, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 91–CF–1188.

District of Columbia Court of Appeals.

Argued April 21, 1993.

Decided Sept. 9, 1993.

Matthew C. Leefer, Frederick, MD, appointed by this court, for appellant.

Daniel M. Zachem, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., at the time the brief was filed, and Thomas C. Black and Daniel S. Friedman, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before ROGERS, Chief Judge, and TERRY, Associate Judge, and BELSON, Senior Judge.

ROGERS, Chief Judge:

Appellant Bruce E. Void appeals his convictions by a jury of conspiracy to distribute and possess with the intent to distribute phencyclidine ("PCP") and cocaine, in violation of D.C.Code § 33–541(a)(1) and § 33–549 (Repl.1988) and first-degree murder while armed, in violation of D.C.Code § 22–2401 and § 22–3202 (Repl.1989). On appeal, his principal contentions are that the motions judge erred by denying the motion to sever the conspiracy and murder charges under Super.Ct.Crim.R. 14, and that the trial judge erred by denying the motion for a mistrial as a result of prejudicial, improper remarks made by the prosecutor in opening and closing arguments to the jury.[1] We affirm.

## I.

*The Conspiracy.* At trial, the government sought to prove that Tyrone Carrington (the decedent), William Johnson, and appellant had been partners and co-conspirators in a cocaine and PCP distribution operation that went awry. According to the government's evidence, appellant and Johnson entered a partnership in 1987 to sell cocaine and PCP in southeast Washington, D.C. One of the wholesalers from whom they purchased cocaine was Tyrone Carrington. In the summer of 1988, appellant and Johnson would buy as much as five to six ounces of cocaine at a time from Carrington. As the relationship proved mutually prosperous, Carrington decided in the fall of 1988 to take appellant and Johnson into his operation as partners. Instead of selling the cocaine to appellant and Johnson, he would distribute the drugs to them and the profits would be split three ways. The three men also became "very close" on a personal level, frequently socializing with each other.

Business for the trio continued to prosper throughout 1989, with the partnership's business primarily operating out of two apartments. One was the apartment of Crystal Brown, who was Carrington's girlfriend, on Glassmanor Drive in Oxon Hill, Maryland. Typically, every two or three days in 1989, Johnson and Carrington would bring a kilogram of cocaine, which cost between $20,000 and $25,000 wholesale, to the Glassmanor apartment and supervise its "cooking" into crystalline crack form. After ten ounces had been prepared for distribution, appellant and Johnson would distribute it to their street-level sellers. Later they would collect the money from these sellers and give it to Crystal Brown, who would place the money along with the remaining twenty-six ounces of cocaine in her closet. The other base of the partnership's operation was Johnson's apartment in Temple Hills, Maryland, which was used mainly to prepare and store the PCP for distribution.

During the summer of 1989, a schism surfaced among the three partners. Apparently, appellant began to distrust Carrington and discussed his concerns with his girlfriend and Johnson.[2] In the meantime, however, Carrington and Johnson continued to grow closer. Bothered by this newfound closeness, appellant began to withdraw from the threesome's social activities. The three did, however, take a week long cruise together in August of 1989.[3] Appel-

---

1. Appellant was charged in a six-count indictment along with William Johnson with conspiracy to distribute and possess with intent to distribute cocaine and phencyclidine (PCP), D.C.Code §§ 33–541(a)(1), –549 (Repl.1988); premeditated first-degree murder while armed, D.C.Code §§ 22–2401, –3202 (Repl.1989); possession of a firearm during a crime of violence, *id.* § 22–3204(b) (Supp.1992); and carrying a pistol without a license, *id.* § 22–3204(a). Prior to trial, the two defendants' cases were severed from each other. The jury was unable to reach a verdict on the possession of firearm during the commission of a crime of violence and carrying a pistol without a license charges, and the

trial judge granted the government's motion to dismiss those charges.

2. There was also evidence that Carrington had accused appellant of not turning over money, and vice versa.

3. Before they left on the cruise, Carrington and Johnson went to a shooting range in Maryland where they each shot a new 9 mm. pistol owned by Melvin Taylor. Carrington agreed to store the gun at his house, and Johnson took the gun along with two bags of cocaine and a pump shotgun to Ms. Brown. She put the items in the closet of her Glassmanor apartment.

lant and Johnson discussed the situation, and Johnson informed appellant that Carrington had said that he would like to see appellant dead and had tried to convince Johnson to do the job. Johnson also told appellant they had purposely tried to provoke appellant on one occasion. After the cruise, Carrington told a girlfriend that he wanted to "get away" from Johnson and switch to a legitimate career in real estate.

*The Murder.* On August 31, 1989, one day before Carrington's murder, appellant, Johnson, and Carrington obtained a kilogram of cocaine and conducted their usual practice of preparing it for distribution at the Glassmanor apartment. Consistent with practice, the remaining cocaine that had not been "cooked" was placed in the closet where Crystal Brown had put the 9 mm. pistol and pump shotgun that Johnson asked her to store. *See supra* note 3.

According to Crystal Brown, at 9:45 p.m. on September 1, 1989, she "beeped" Carrington from a telephone booth on Kenilworth Avenue on her way to a disco. A short time later, Carrington arrived in his black Corvette with Johnson in the passenger's seat. Ms. Brown testified that appellant was driving his black truck alone behind the Corvette. After a brief conversation, Carrington and Johnson drove off with appellant following them. Before going to the disco, Ms. Brown stopped at her Glassmanor apartment and instructed Carlos Carrington, who was Tyrone Carrington's thirteen-year-old son, and Calvin Moore III, who was Ms. Brown's twelve-year-old brother, "to lock the door, not to answer the door but to answer the phone." After she left the apartment, she made

sure that both locks on the door were secured.

Sometime after the meeting with Ms. Brown, Carrington, Johnson, and appellant drove to 2730 Langston Lane, S.E., where Carrington met Clarine Howard, who was one of Carrington's street sellers. Ms. Howard testified that after she turned over money from her PCP sales to Carrington, she went outside and watched Carrington and Johnson drive away in a black sports car. She also thought that there was a black "Blazer" on the road at the time, but she could not precisely recall its path.[4] Moments later, Ms. Howard discovered Carrington dead in the car on Hartford Street.

Officer Samuel Howard heard one or more gunshots, proceeded in his cruiser to the intersection of 22nd and Hartford Streets, and found Carrington slumped over at the wheel of the Corvette. Carrington had been shot twice in the head, once from each side.[5] The car doors were closed but unlocked; the headlights were on, and the engine was off but warm. The officer did not find either the key chain, which contained a key to Crystal Brown's Glassmanor apartment, or the car telephone.

*The Break–In.* Approximately five minutes after Carrington was shot, a telephone call was made from Carrington's portable telephone to Crystal Brown's Glassmanor Drive apartment. Three minutes later, at 11:31 p.m., another telephone call was made to the Glassmanor Drive apartment, this time on appellant's portable telephone. A next-door neighbor testified that at about 12:11 a.m., he heard three gunshots come from inside Ms. Brown's apartment.[6]

---

**4.** Two other witnesses testified as to similar details. Crystal Rawlings testified that she saw the three men briefly that night on Langston Lane, and that when they left Carrington was driving the Corvette with appellant following him in a black or blue "truck." Marilyn Cole testified that that night she had received two telephone calls from her boyfriend, who told her that he had been shot at and run off the road earlier that night by "Williams and Tyrone," who were driving a "black vet" and a "black [B]lazer." At that moment Cole looked out her window and saw a black Corvette, followed by a black Blazer, drive by her house and

turn off Langston Lane; she recalled seeing the word "Jimmie" written on the rear spare tire. Appellant's black truck had a spare tire with the word "Jimmie" on it.

**5.** Carrington had apparently been shot from the driver's side by a .45 pistol, and from the passenger's side by a .38 pistol.

**6.** The neighbor did not hear Ms. Brown screaming until 2:30 a.m., and then he called the police. At trial, the neighbor only testified that he called the police as a result of hearing a disturbance in the apartment.

When Ms. Brown arrived home from the disco, she found the bottom (automatic) lock locked. Although there was no sign of forced entry, she discovered that her apartment had been entered; the apartment was in disarray, and the money, drugs, and guns that she kept in the closet were gone.[7] The police recovered three .45 caliber shell casings and bullets from the apartment; expert evidence showed that the .45 caliber pistol fired in the Glassmanor apartment that night was the same one fired at the scene of Carrington's murder.

A week later, while sitting in appellant's truck, appellant and Johnson were arrested for Carrington's murder. The police recovered from Johnson the 9 mm. pistol that had been stolen from the Glassmanor apartment on the night of Carrington's murder. The jury found appellant guilty of conspiracy to distribute and possess illegal drugs with intent to distribute and first-degree murder while armed.[8]

## II.

 Appellant contends that the motions judge erred in denying the motion to sever the conspiracy and murder counts under Rule 14 because of the prejudice resulting from the introduction of evidence of appellant's involvement in a drug conspiracy.[9]

He maintains that the evidence of the conspiracy was not separate and distinct from the murder and related charges, and that the motions judge misinterpreted applicable authority on the identity exception under *Drew*.[10] Appellant argues that while the evidence of the crimes at the Glassmanor apartment tended to prove the identity of Carrington's killer insofar as it implicated William Johnson,[11] it did not likewise connect appellant to the killing because he was not as clearly linked to the entry. He concedes that evidence of the murder would have been admissible at a conspiracy trial, but he contends that the evidence of the offenses at the Glassmanor apartment would not have been admissible as proof of appellant's involvement in Carrington's killing since "the conspiracy count [was] little more than a pretext for evading the *Drew* requirement."[12] Appellant argues that the Glassmanor apartment offenses evidence served only to bolster the government's case against him for murder through propensity inferences, noting the trial judge's observation that the whole trial was "permeated with the Maryland evidence." Hence, appellant contends that because he suffered compelling prejudice from the joinder of the offenses, reversal is warranted.

7. Ms. Brown also discovered the bodies of the two boys, who had been shot, although she was not permitted to testify about this fact in front of the jury.

8. Appellant's defense was that Johnson had murdered Carrington and broken into the Glassmanor apartment. At trial, appellant presented three witnesses. Cynthia White testified that although she had seen Carrington and Johnson riding in the black Corvette the night of the murder, she had not seen a black truck following the Corvette as it left Langston Lane. On cross-examination, she admitted that she was not sure if a black truck had followed the Corvette *onto* Langston Lane and that she could not say for sure that there was no black truck because she had turned away. FBI Special Agent John Brown, an expert in serology, testified that he could not detect any blood present on the .45 caliber bullet recovered at the scene of Carrington's murder. FBI Special Agent Buechele, an expert in materials analysis, testified that he found a black "paint-like" smear on the surface of the bullet.

9. In his written motion to sever, appellant argued that there was no physical or scientific evidence linking him to the murder of the two boys in the Glassmanor apartment and asked for severance of the conspiracy counts without stating that joinder would adversely affect his defense. The motions judge concluded that the evidence was both directly relevant to Carrington's murder and probative of the killer(s)' identity, and that the probative value of the conspiracy evidence outweighed any prejudice.

10. *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964).

11. The 9 mm. pistol taken from the apartment the night of Carrington's murder was recovered from Johnson as he and appellant sat in appellant's truck one week after the murder.

12. By the "Glassmanor apartment offenses," we refer to the break-in, entry, and taking of the items stored in Crystal Brown's bedroom closet—the twenty-six ounces of cocaine, the 9 mm. pistol, and the $1,000 in cash.

■ Strong policy reasons exist in favor of joint trials where offenses have been properly joined under Super.Ct.Crim.R. 8(a). *See Sousa v. United States*, 400 A.2d 1036, 1040 (D.C.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 485, 62 L.Ed.2d 408 (1979); *see also Arnold v. United States*, 511 A.2d 399, 404 (D.C.1986) (citations omitted). Indeed, severance is only necessary "when a defendant cannot receive a fair trial." *Baxter v. United States*, 352 A.2d 383, 385 (D.C.1976). Under Rule 14, offenses should be severed:

> "unless (1) the evidence as to each offense is separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass, or (2) the evidence of each of the joined crimes would be admissible at the separate trial of the others."

*Cox v. United States*, 498 A.2d 231, 235 (D.C.1985) (quoting *Bridges v. United States*, 381 A.2d 1073, 1075 (D.C.1977), *cert. denied*, 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978)). *See also Coleman v. United States*, 619 A.2d 40, 43–44 (D.C. 1993). The decision to sever is committed to the sound discretion of the trial judge and will be reversed "only upon a showing of the 'most compelling prejudice.'" *West v. United States*, 599 A.2d 788, 791 (D.C. 1991) (quoting *In re S.G.*, 581 A.2d 771, 776 (D.C.1990)). *See Gooch v. United States*, 609 A.2d 259, 264 (D.C.1992); *Winestock v. United States*, 429 A.2d 519, 526–27 (D.C. 1981). Moreover, the court has recognized that "conspiracy cases are *sui generis* with respect to the admission of evidence," with "wide latitude" being accorded to the trial court. *Holmes v. United States*, 580 A.2d 1259, 1268 (D.C.1990) (citation omitted). For several reasons, we conclude that the trial judge properly denied appellant's motion for severance.

■ First, the similarities in the Glassmanor offenses and the murder rendered highly likely the possibility that they were committed by the same person or persons. Evidence that the fruits of one crime have been used to carry out a subsequent crime clearly may cause the crimes to be sufficiently "connected together" to warrant their being tried together. *See Blunt v. United States*, 131 U.S.App.D.C. 306, 311, 404 F.2d 1283, 1288 (1968) (citation omitted), *cert. denied*, 394 U.S. 909, 89 S.Ct. 1021, 22 L.Ed.2d 221 (1969); *United States v. Leonard*, 144 U.S.App.D.C. 164, 166, 445 F.2d 234, 236 (1971) (citation omitted).[13] In *Blunt, supra*, 131 U.S.App.D.C. at 308, 404 F.2d at 1285, where a checkbook was stolen and then used to commit frauds, forgeries, and utterings, the counts were all tried together. The United States Court of Appeals for the District of Columbia Circuit upheld the joinder, reasoning that "the theft of the checkbook used hours later to commit the fraud and the forgeries is 'connected together' with these latter offenses within the meaning of [Rule 8]." *Id.* Similarly, in *Leonard, supra*, 144 U.S.App.D.C. at 166, 445 F.2d at 236, the same court rejected the defendant's Rule 14 prejudice challenge to the joint trial of charges for burglary and subsequent fraudulent use of a credit card stolen in the initial burglary.

The motions judge could reasonably find that the evidence of the break-in of the Glassmanor apartment was clearly "connected together" with the murder of Tyrone Carrington. Appellant concedes in his brief on appeal that "[t]he available evidence did link the shooting of Tyrone Carrington to the entry at Glassmanor Drive...." The government offered proof that whoever killed Carrington obviously had knowledge of the intricacies of his drug business. The person(s) who killed Carrington, the only partner who had keys to the apartment where the partnership

---

13. On appeal, the government maintains that the evidence of the break-in was admissible under *Toliver v. United States*, 468 A.2d 958, 961 (D.C.1983), to complete the story of Carrington's murder and to explain the immediate surrounding circumstances, which is not really "other crimes" evidence within the meaning of *Drew*, citing *Parker v. United States*, 586 A.2d 720, 724 (D.C.1991), and *Derrington v. United States*, 488 A.2d 1314, 1338 (D.C.1985), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 201 (1988). The court has noted, however, the limits of *Toliver* evidence. *Holmes, supra*, 580 A.2d at 1266. In any event, we need not reach this issue.

assets were stored, took his keyring. Within fifty minutes of the discovery of Carrington's body, his keys were used to enter the apartment for the purpose of taking only the partnership assets that were kept there. Given the unforced entry, a reasonable inference was that whoever killed Carrington and stole his keyring, used the keys to get into the Glassmanor apartment in order to steal the drugs, money, and gun. Once in the apartment, whoever broke in was familiar enough with the operation to know that those items were stored in the bedroom closet, as evidenced by the fact that little else was disturbed in the apartment. Further, the same gun used to kill Carrington was also fired three times in the Glassmanor apartment. As in *Leonard, supra,* both crimes were similar in their "inside job" characteristics and "the facts impelled the conclusion that the burglary was perpetrated by someone who knew precisely where various items in the house were kept." 144 U.S.App.D.C. at 165, 445 F.2d at 235 (footnote omitted).

■ Second, under the *Drew* analysis, evidence of the conspiracy and murder charges would have been mutually admissible at separate trials. Evidence of the drug conspiracy and crimes at the Glassmanor apartment was admissible to show appellant's motive to kill and, inferentially, his identity as one of Carrington's killers. The court has stated that "other crimes evidence may be admitted to show the defendant's motive, even though motive is not an element of the offense charged or a contested issue, where identity is a contested issue and evidence of motive may help to prove identity." *Robinson v. United States,* 623 A.2d 1234, 1239 (D.C.1993) (citing *Hazel v. United States,* 599 A.2d 38, 41–42 (D.C.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 374, 121 L.Ed.2d 286 (1992); *Green v. United States,* 580 A.2d 1325, 1328 (D.C.1990)). *See also Hill v. United States,* 600 A.2d 58, 61 (D.C.1991). When motive evidence is offered to show identity, the court must consider two factors—the extent to which the suggested motive is peculiar to the defendant, and whether the motive attributed to the defendant particularly concerns the victim of the crime

charged. *Robinson, supra,* 623 A.2d at 1239.

In the instant case, the suggested motive was unique to appellant and his codefendant. The government's theory was that Carrington, the reluctant partner and supplier who had expressed a desire to get out of the drug business, had been murdered by his two partners. According to the government's evidence, appellant and Johnson were pleased with their profitable drug operation and did not want to see it come to an end. On the other hand, Carrington wanted out, and he was trying to put together sufficient capital to go into the real estate business. Appellant thought Carrington was siphoning off partnership assets. To this extent, the details concerning the drug business, which formed the basis of the conspiracy charge, were admissible to demonstrate why appellant, as one of the three partners, would have a motive to kill Carrington, the partner who wanted out. *See Daniels v. United States,* 613 A.2d 342, 344, 348 (D.C.1992) (evidence of defendants' drug operation properly admitted at murder trial where such evidence established their motive to kill competitor in drug sales); *Yelverton v. United States,* 606 A.2d 181, 182–83 (D.C.1992) (evidence of drug debt owed to defendant by victim properly admitted to show defendant's motive and identity).

Furthermore, evidence of the subsequent theft of the drugs, money, and guns was admissible as further evidence of appellant's motive, which was probative of identity by inference that whoever killed Carrington had also stolen his keys in order to gain entry into the apartment to recover the partnership assets. The evidence of the careful and deliberate raiding of the Glassmanor apartment also uniquely linked the two partners—appellant and Johnson—to the crimes because whoever removed the drugs, money, and guns apparently knew exactly where to find them. In addition, a pistol that had been stolen from the apartment that night, *see supra* note 3, was found on Johnson one week after the murder when he was arrested while sitting in appellant's truck. Although the evidence

connecting Johnson to the Glassmanor apartment break-in was stronger, the evidence that a telephone call was made to the apartment on appellant's cellular truck telephone very shortly after Carrington was murdered connected appellant to the break-in, given his business relationship with Johnson and Carrington.

Finally, the motive attributed to appellant is particularly related to Carrington, the decedent. Clearly the conspiracy evidence stemming from the drug operation was probative on this point. The personal enmity between appellant and Carrington was mutual and related to their drug business. Appellant not only thought that Carrington was siphoning off partnership assets for himself, but he was aware that Carrington had tried to get appellant's former best friend, Johnson, to kill appellant. Twelve days after Johnson told appellant about this, Carrington was murdered. *See United States v. Bobbitt,* 146 U.S.App.D.C. 224, 228, 450 F.2d 685, 689 (1971) ("[t]he prior relationship between the parties is obviously material in determining what motive the defendant might have had to shoot decedent," particularly where there has been "bad blood" between them); *see also Young v. United States,* 515 A.2d 1090, 1095 (D.C.1986). Similarly, the evidence of the Glassmanor apartment offenses was admissible to demonstrate a motive to kill Carrington. Unlike the situation in *Robinson, supra,* 623 A.2d at 1240, where there was no connection established between the other crimes that the government sought to introduce and the victim, in the instant case there was a clear link between the Glassmanor apartment offenses and Carrington. The apartment belonged to Carrington's girlfriend and Carrington was the only partner with keys to it. Whoever killed Carrington presumably took his keys, since they were not recovered from his car at the scene of his murder and the entry into the Glassmanor apartment was unforced. A telephone call was made from appellant's car phone to the apartment within ten minutes of Carrington's murder. One of the guns used to kill Carrington was subsequently fired three times in the Glassmanor apartment. Given the reasonable inference that the break-in was one of the immediate objects of Carrington's murder, the Glassmanor apartment offenses evidence would have been admissible at a separate murder trial under the motive exception. *Cf. Minick v. United States,* 506 A.2d 1115 (D.C.), *cert. denied,* 479 U.S. 836, 107 S.Ct. 133, 93 L.Ed.2d 76 (1986).

### III.

■ Appellant also contends that the trial judge erred by denying the motion for a mistrial based on prejudicial prosecutorial remarks during opening and closing arguments to the jury with regard to the presence of the two young boys in Ms. Brown's apartment on the night of the break-in at the Glassmanor apartment.[14] Although the danger of prejudice presented by the prosecutor's opening statement was considerable, the trial judge managed to salvage the situation in a manner that eliminated further prejudice.

■ *Prosecutor's Opening Statement.* At a pretrial hearing, the motions judge ruled that the fact that the two boys were murdered the night that Carrington was murdered should not come into evidence because it was too prejudicial.[15] The motions judge explained:

**14.** The first step in our analysis is to determine whether any of the challenged statements made by the prosecutor were improper. *McGrier v. United States,* 597 A.2d 36, 41 (D.C.1991) (citations omitted). If we find them to be improper, we must then assess prejudice by, "viewing the remarks in context, 'consider[ing] the gravity of the [impropriety], its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case.'" *Id.* (quoting *Dixon v. United States,* 565 A.2d 72, 75 (D.C.1989)). Even if a prosecutorial statement was improper, we will affirm the conviction unless the defendant suffered "substantial prejudice" as a result. *Id.* (citing *Williams v. United States,* 483 A.2d 292, 297 (D.C.1984), *cert. denied,* 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985)).

**15.** The motions judge noted that if the government was unwilling to dismiss the murder of the two boys as objects of the conspiracy in the indictment, then there was a question whether the drug conspiracy count had to be separated from trial of the murder count. The prosecutor

Well, the scope of my ruling is that the two killings in the Glass Manor [sic] Apartments are not to come into evidence at this trial. That's my ruling.

I thought, I thought that the Government should be able to bring in essentially the other facts that tie the killing of Tyrone Carrington into what happened at the Glass Manor Apartments.... [T]he Government can just introduce the fact that .45 slugs traceable to the .45 that was on the scene in Tyrone Carrington's murder were also found on the scene of the Glass Manor Apartments, just not explaining where on the scene they were found.

During his opening argument, the prosecutor made several statements that appellant claims cumulatively operated to circumvent this ruling by producing the inescapable conclusion that the boys had been murdered.

First, appellant points to the fact that the prosecutor placed the boys in the apartment at the time of the break-in. The prosecutor first mentioned the boys when he described Crystal Brown's activities the day of Carrington's murder and the break-in.[16] The prosecutor then described how the three of them left Crystal Brown's grandmother's house and went to a Kenilworth Avenue pay phone where Ms. Brown called Carrington's beeper.[17] He then explained how Ms. Brown and the boys ended up at the Glassmanor Drive apartment, and he described how Ms. Brown left the apartment that evening with the boys still inside, warning them not to open the door to anyone.[18] Second, appellant contends that the prosecutor's statement pertaining to the stipulation that the same .45 caliber gun that was fired at the scene of Carrington's murder was also fired three times inside Crystal Brown's apartment that same evening increased the likelihood that the jury would conclude that the boys were also murdered that night.[19] Third, appellant contends that the prosecutor's explanation

---

stated that he understood, but questioned whether the government would appeal the ruling, and asked the judge to reconsider his ruling. The judge declined to change his mind, noting that the evidence connecting Johnson was a lot stronger and that keeping out evidence of the murder of the two boys was a way to balance the probative value and prejudicial effect in appellant's case.

**16.** The prosecutor told the jury:
Friday, September 1st, Crystal Brown was planning to go to a disco given by her grandfather.... It wasn't unusual for her to go out. Now, living with her in her apartment at the time were two boys, 12 and 13 years old. The 13–year–old boy was Tyrone Carrington's son. His name was Carlos Carrington.
The other boy, 12 years old, was Crystal Brown's little brother, Calvin Moore, the Third. On the night of the incident—well during the day of September 1st ... Crystal Brown was much of the day at her grandmother's house ... and she had the two teenage boys with her.

**17.** The prosecutor stated to the jury:
So she was there with her friend and the two boys and the black Corvette pulled up. Tyrone Carrington's black Corvette, the one he was killed in. And Tyrone Carrington was driving and William Johnson was in the passenger's seat, two-seat car, and behind them was [appellant] Bruce Void. And he was in his black truck.

**18.** The prosecutor stated:

She reminded her brother and Tyrone's son, her brother, Calvin the 12 year old, and Tyrone's son, Carlos the 13 year old, of the regular instructions which were, answer the phone, don't open the door. And she said, her instructions were, don't open the door to anyone. And she'll tell you she had tested that instructions on those boys to not even open the door even to her. That she then went out of the apartment leaving the boys there. That the door was shut. She'll explain to you the way her door worked.... And she heard the boys locking that lock from the inside as she left.

**19.** The prosecutor stated:

[I]t is stipulated that three .45 caliber shell casings and three .45 caliber fired-off bullets were recovered by the Prince George's police. And then you will hear evidence from the FBI expert that those .45 caliber shell casings and those .45 caliber fired-off bullets from the apartment in Maryland were fired by the same gun that fire [sic], where Tyrone Carrington was killed. So you'll see that this same person, the persons who went into that apartment in Maryland are the persons who knew all about the drug operations, the persons who were with Tyrone Carrington when he left Langston Lane and killed him.

of the circumstances, that Ms. Brown's screaming brought the police to the Glassmanor Drive apartment, contributed to create the inescapable conclusion by the jury that the boys had been murdered.[20]

According to appellant, he was "intolerably" prejudiced by these three statements—the placing of the two boys in the apartment, the mention of the three bullets being recovered from the apartment, and the statement that it had been Crystal Brown's screams after entering the apartment that prompted a neighbor to call the police—in view of the obvious absence of the boys as witnesses at trial. He maintains that by making these statements, the prosecutor effectively called to the jurors' attention the very fact that the motions judge had ruled was to be excluded, namely that the two boys had been murdered that night in Ms. Brown's apartment.

The government responds that the prosecutor adhered to the motions judge's ruling. The motion judge's explanation of his ruling made clear that the government was not prohibited from bringing "the other facts that tie the killing of Tyrone Carrington into what happened at the [Glassmanor] Apartments," by showing that Carrington's killer or killers must have been familiar with the workings of his drug business. The government, however, proposes too narrow a view of the motions judge's ruling. The fact that the prosecutor did not expressly refer to the murder of the two boys, standing alone, was not enough

to ensure compliance with the motions judge's ruling. While the prosecutor's care to avoid mentioning that the two boys had been murdered may have arguably been compliance with the letter of the ruling, it was not in keeping with its clear spirit. As the trial judge acknowledged, "it's going to be a little hard for them [the jury] not to draw the conclusion that those boys are not here because they are in fact dead." The motions judge's ruling was based on the extremely prejudicial nature of evidence that the same person or persons who had killed Carrington had also shot his son and his girlfriend's teenage brother, and the absence of any real prejudice to the government's case by omission of the boys' murders. While other facts about appellant's connection to Ms. Brown's Glassmanor apartment were not barred, it would seem extraordinary, as the trial judge suggested, to suppose that the motions judge intended for the government to be able to put in evidence everything—the boys' presence, Ms. Brown's instructions to them, the three shots, Ms. Brown's screaming—except the fact that the two boys were found murdered.[21]

While the prosecutor's opening remarks did not flagrantly exceed the technical bounds of the judge's ruling, there was no reason to mention the two boys at all.[22] Indeed, the prosecutor suggested a concern, after the fact, that the uncertainty about the two boys could work against the government's case.[23] Of course, this was a

---

**20.** The prosecutor told the jury:

And then the evidence will show you that at about midnight, at about midnight, three shots were fired. Ladies and gentleman, when Crystal Brown came home, the neighbor who heard the three shots didn't call the police at that time. But later, when Crystal Brown came into her apartment at 2:30 or 2:45 in the morning and *she started screaming,* that's when the neighbor ended up, or the neighbor's roommate called the police. [emphasis added]

**21.** During the discussion of the prosecutor's opening statement, the trial judge stated:

I think the logic of the decision to keep out the references to the homicides of these two boys would include the logic of, frankly, keeping them outside, of that apartment that night. I just don't know how else to solve this prob-

lem. . . . But it seems obvious to me that the implications are pretty powerful that those three bullets that are being stipulated to found their way into the bodies of these two boys and that the screaming by this sister could have been related only to something like an event of that nature.

**22.** Defense counsel made clear that the prosecutor's concern about mentioning the boys' presence in the apartment in connection with the two telephone calls was meritless. He noted that the only fact of any probative value was that the calls had been made, and that whether the boys received the calls or let the answering machine take them was irrelevant.

**23.** In seeking an instruction that the jurors were not to draw any negative inferences from the fact that the two boys did not testify, the prosecutor stated:

problem of the government's own making and, thus, is of little consequence in our evaluation of prejudice to appellant. *Cf. Parker v. United States, supra* note 13, 586 A.2d at 725–26. We conclude, however, that appellant was not substantially prejudiced by the prosecutor's remarks during opening statement.[24] *See McGrier, supra,* 597 A.2d at 41.

First, the trial judge struck a careful balance between excluding the explosively prejudicial evidence relating to the Glassmanor apartment offenses and admitting only those parts that supported the government's theory that Carrington's murder and the break-in were effected by the same person(s), thereby ensuring adherence to the spirit of the motions judge's ruling. Making a "solomonic decision," the trial judge ruled that the prosecutor would be permitted to present evidence that Ms. Brown left the boys in her apartment with instructions on the night Carrington was murdered, but that the prosecutor could not make any reference to the fact that Ms. Brown had screamed when she had arrived home that night. In fact, this is all the evidence the jury heard.

Second, the judge instructed the prosecutor to make certain that the government's witnesses did not make any reference to the murder of the two boys, including Ms. Brown's screams. Accordingly, when Ms. Brown's neighbor testified, he referred only to a "disturbance," which prompted him to call the police, rather than to hearing Ms. Brown's screams. When Ms. Brown was asked why she was testifying, the trial judge summoned counsel to the bench to ensure that she did not refer to the murder of her brother and Carrington's son.

In assessing prejudice, moreover, it is of some significance that defense counsel, who was alert to the possibility of prejudice, did not initially ask for a mistrial upon hearing the prosecutor's opening statement to the jury. Defense counsel waited until the opening statement was completed to make his objection so as not to draw further attention to the issue, and he also asked that the prosecutor's opening statement not be highlighted with the instruction that the prosecutor was requesting. In exchange for assurance that the prosecutor would not "deliver" on the promises made in his opening statement regarding Ms. Brown's screams, defense counsel agreed not to make a missing witness argument or argument that the prosecutor had failed to prove some points mentioned in his opening argument. Hence, the evidence and argument after the prosecutor's opening argument did not indicate that the two boys had died, and that was the goal which the trial judge viewed as crucial. It was only after the trial judge had ruled that the prosecutor would be permitted to introduce evidence that the two boys were in the apartment and that Ms. Brown had instructed them not to let anyone inside, that defense counsel expressed concern about prejudice to the defense. At that point, he moved for a mistrial, which the judge denied, stating that "I think we can keep it clear, clear as possible." The judge also gave the standard instructions that the arguments of counsel were not evidence and that the jury was to decide the case on the basis of the evidence presented at trial.

There couldn't possibly be any juror on that jury who won't think about this and wonder where are the two boys. It will work to the disadvantage of the Government in my experience because witnesses like this undermine ready access, since the older sister of one is my first witness and since they are obviously cooperative, the jurors will speculate and they will think there is something to hide and they will, in my experience and those of my colleagues, they could hold it against the Government.

24. The trial judge took a recess and later reported that he had spoken with the motions judge about the proceedings before him the previous day. The trial judge stated that "I'm satisfied that there was a discussion … with him about the telephone calls and the fact that the boys were there during the time that the calls were placed." Apparently, the motions judge had in mind that at this point there would be an instruction to the jury to give no weight to the absence of the boys at trial. The trial judge stated that with respect to an issue not discussed with the motions judge—the reference to the neighbor hearing screaming at 2:30 a.m.—he was satisfied that had it been raised, the motions judge would have barred it from evidence.

Under all the circumstances, we find no abuse of discretion by the trial judge in denying the motion for a mistrial. *Lee v. United States,* 562 A.2d 1202, 1204 (D.C. 1989). The trial court's ruling was neither unreasonable nor irrational, but rather a carefully crafted solution arising out of an unforeseen situation that fairly accommodated both sides. While the prosecutor should not have blurted out in his opening statement assertions of forthcoming proof to which defense counsel had objected during prior discussions with the motions judge, defense counsel should have alerted the trial judge (who was not the motions judge and therefore was unaware of defense counsel's previous concern) before the opening argument began of his desire to have settled the matter of what evidence the prosecutor could introduce at trial. The evidence heard by the jury suggested possible explanations other than the death of the two boys. In view of the absence of further argument to suggest such a sinister result, the trial judge could reasonably conclude that appellant would not be substantially prejudiced.

■ *Prosecutor's Closing Argument.* Appellant also contends that the prosecutor's closing included an impermissible comment on appellant's decision not to testify.[25] *See Griffin v. California,* 380 U.S. 609, 614, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965); *Peoples v. United States,* 329 A.2d 446, 450 (D.C.1974). Reading the

prosecutor's comments in context, *see McGrier, supra,* 597 A.2d at 41; *Coleman v. United States,* 515 A.2d 439, 450 (D.C. 1986), *cert. denied,* 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 205 (1987), we find appellant's argument unpersuasive.

The trial judge found that the prosecutor had made this statement in response to defense counsel's suggestion in his closing argument to the jury that it was possible that appellant, unaware of Carrington's death, was alone in his car looking for Carrington when he made the telephone call to Crystal Brown's apartment. As the government states in its brief on appeal, "the intent [of the prosecutor's statement] was to properly rebut a theory advanced by opposing counsel by summarizing the relevant evidence and suggesting that that evidence leads inexorably to a contrary conclusion." Also, the nature of the government's proof on this point distinguishes it from those cases cited by appellant in which there has been prosecutorial misconduct.

In each case cited by appellant, the government presented direct evidence whereby the defendant was the only person who could rebut that testimony because only he and the witness were present when the events took place.[26] By contrast, the instant case did not involve a situation in which a prosecutorial labeling of testimony as "uncontradicted" infringed upon appellant's Fifth Amendment privilege not to

25. The prosecutor argued to the jury that:
Ladies and gentlemen, the evidence showed you [appellant] was at Langston Lane in that Jimmy [sic]. And from there, the evidence along this road is circumstantial, but it is a—it is link after link after link in a chain to the place where the Corvette stopped, to the first shot, to the shot by the second gunman, and to Mr. Johnson having a ride to leave in—a vehicle to leave with, getting in Mr. Void's truck. They drive away. They have the keys. After to [sic] the call from which there is no explanation possible. There is no other logical explanation. He wasn't looking for Tyrone.

26. *See White v. United States,* 248 A.2d 825, 825 & 826 n. 2 (D.C.1969) (prosecutorial misconduct to comment on uncontradicted nature of police officers' testimony when officers and appellant were only ones at the scene); *United States v.*

Handman, 447 F.2d 853, 855 (7th Cir.1971) (comment about "uncontradicted" testimony improper where witness testified as to conversation with appellant and appellant was thus the only one in a position to contradict); *United States v. Flannery,* 451 F.2d 880, 882, (1st Cir. 1971) (prosecutor's characterization of witness' testimony as to conversations between himself and appellant as uncontradicted improper); *Rodriguez–Sandoval v. United States,* 409 F.2d 529, 529–30 (1st Cir.1969) ("uncontradicted" comment improper where witness was government agent, who along with another agent and appellant, were only people at scene of crime), *cert. denied,* 414 U.S. 869, 94 S.Ct. 180, 38 L.Ed.2d 115 (1973); *Desmond v. United States,* 345 F.2d 225, 226 (1st Cir.1965) (improper to refer to agent's testimony as uncontradicted when he and two defendants were only people present at the drug transaction).

testify, by effectively forcing him to abandon his right not to testify or to allow testimony that only he can rebut to be characterized as "uncontradicted." *See Flannery, supra,* 451 F.2d at 882. The only eyewitness evidence was that appellant was on Langston Lane the night that Carrington was murdered. The rest of the government's evidence was circumstantial. Consequently, both prosecution and defense were asking the jury to infer differing conclusions from the circumstantial evidence—the prosecution asking the jury to believe that appellant made the telephone call after shooting Carrington in preparation for the break-in of Ms. Brown's apartment, the defense asking the jury to infer that appellant was alone in his car and innocently telephoned Ms. Brown's apartment in search of Carrington. These circumstances do not pose the kind of dilemma presented in the cases on which appellant relies. Rather, the prosecution was pitting inference against inference, not "uncontradicted" eyewitness testimony against defense inference. Sifting through opposing inferences is the quintessential jury function. Hence, the prosecutor's statement that his scenario was the only "logical explanation" was not improper.

 Accordingly, we affirm the judgments of conviction.[27]

---

**27.** Appellant's other contentions are meritless. We find no error in the exclusion of evidence allegedly implicating another person in the murder. The defense sought to introduce testimony from Ms. Brown that Carrington had stated that he had decided to end his involvement in the drug distribution ring partly because of a distrust of Johnson and a man named John Blunt, stemming from an awareness that they had begun killing people. In addition, appellant sought to present evidence that after Carrington's murder, Blunt had been found in possession of a .45 caliber pistol that could have been the one used to kill Carrington. Aside from hearsay problems, Carrington's statement would not have established the "clear link" between Blunt and Carrington's murder, and thus did not tend to create a reasonable doubt that appellant had killed Carrington. *See Johnson v. United States,* 552 A.2d 513, 516–17 (D.C.1989); *Stack v. United States,* 519 A.2d 147, 152 (D.C. 1986); *Beale v. United States,* 465 A.2d 796, 803 (D.C.1983), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984); *Brown v. United States,* 409 A.2d 1093, 1097 (D.C.1979). Whether Johnson and Blunt were the actual perpetrators was obviously material to appellant's defense, but merely reciting Carrington's belief that the two had killed other persons did not tend to establish that they also killed Carrington. Carrington's "belief" about Johnson and Blunt's activities is not affirmative *proof* that they had actually perpetrated such acts tending to indicate that they had also killed Carrington. Even if Carrington's belief that Johnson and Blunt had killed others were confirmed, defense counsel proffered no evidence to show a connection between those murders and Carrington's murder. As in *Johnson, supra,* 552 A.2d at 518, the evidence of Carrington's statement would have amounted to nothing more than a proffer that Johnson and Blunt "had committed other crimes, and had an opportunity to commit this one." This is not the requisite "clear link" that must be established before evidence that someone other than the defendant committed the crime will be admitted.

The same reasoning applies to defense counsel's proposal to introduce evidence about the .45 caliber pistol recovered from Blunt more than six months after Carrington's murder. The trial judge properly concluded that the defense had failed to establish a nexus between Blunt's gun and Carrington's murder; there was no evidence that Blunt was on the scene when Carrington was killed, the gun had been recovered so long after the murder, and the expert who examined the gun could not say for certain that it was the one used to kill Carrington. *See Stack, supra,* 519 A.2d at 153.

Nor do we find error in the exclusion of hearsay statements since they were not within the declaration against penal interest exception to the hearsay rule. At trial, defense counsel sought to elicit from Crystal Rawlings, *see supra* note 4, that Johnson had told her that he had been at the scene of the murder when Carrington was shot, that he had not killed him, and that he had fled by jumping out of the car and running through the woods. According to appellant, this evidence would have directly contradicted the government's theory that Johnson and appellant killed Carrington, fled the scene in appellant's truck, and proceeded to the Glassmanor Drive apartment, and it would have destroyed the link between appellant and Johnson, who was directly implicated in the crimes by his possession of the 9 mm. pistol taken from the Glassmanor apartment the night of Carrington's murder. Assuming that Johnson made the statement and that he was unavailable, "corrob-

orating circumstances [did not] clearly indicate the trustworthiness of the statement." *Laumer v. United States,* 409 A.2d 190, 199 (D.C.1979) (en banc) (three part test). None of the statements were inculpatory as the gist of the exchange was Johnson's assertion that he had not killed Carrington. *See id.* at 200 (quoting *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). Appellant's attempt to cast Johnson's admission that he was present at the crime scene as an inculpatory statement is unpersuasive. Rather, as the government suggests, Johnson's statement was simply self-serving and exculpatory, and therefore not within the scope of the declaration against penal interest exception. *See Irby v. United States,* 585 A.2d 759, 765 (D.C.1991) (statement against interest did not have usual indicia of trustworthiness as it was not "significantly" against his penal interest).

Finally, there was sufficient evidence to convict appellant of first-degree murder while armed. Viewing the evidence, as we must, in the light most favorable to the government, *see Lyons v. United States,* 606 A.2d 1354, 1361 (D.C.1992) (citations omitted), the evidence showed that appellant had a motive to kill Carrington, that he was within geographical and temporal proximity to the murder, that he was

linked to Johnson (who possessed the 9 mm. pistol stolen from the Glassmanor apartment the night of the murder), and that the murder was connected to the break-in, in that whoever entered the apartment and took the drugs and gun from the closet knew the details of the partnership's drug business. In the days leading up to the murder, appellant had a motive to kill Carrington. *See Hall v. United States,* 454 A.2d 314, 317 (D.C.1982). Carrington's car was neatly parked, suggesting that he was coaxed to stop; he was shot twice in the head as he sat behind the wheel. This is evidence of a plan, not an improvident act. *See Head v. United States,* 451 A.2d 615, 623 (D.C.1982). Deliberation and premeditation may be inferred from appellant's subsequent participation in the break-in of the Glassmanor apartment. A jury could reasonably find that two partners killed the third partner and promptly divided up the assets of the partnership. *See Mills v. United States,* 599 A.2d 775, 783 (D.C.1991); *see also Lyons, supra,* 606 A.2d at 1361–62 (aiding and abetting); *Gayden v. United States,* 584 A.2d 578, 582–83 (D.C.1990), *cert. denied,* — U.S. —, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991). That much of the government's evidence was circumstantial is irrelevant. *See Lyons, supra,* 606 A.2d at 1361.