James A. JOHNSON and Willie
A. Bullock, Appellants,

v.

UNITED STATES, Appellee.

Nos. 89–640, 89–672.

District of Columbia Court of Appeals.

Argued April 23, 1991.
Decided Sept. 11, 1991.

Calvin Steinmetz, appointed by this court, for appellant James A. Johnson.

Barbara E. Sosnick, appointed by this court, for appellant Willie A. Bullock.

Cathleen Corken, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Roy W. McLeese III, and G. Paul Howes, Asst. U.S. Attys., were on the brief, for appellee.

Before STEADMAN and SCHWELB, Associate Judges, and KERN, Senior Judge.

STEADMAN, Associate Judge:

This case involves a killing that occurred after two months of controversy between drug dealers over an unpaid debt. The principal issue on appeal concerns the trial court's ruling on the extent to which the events leading to the killing could be aired before the jury, and specifically whether that ruling was in harmony with our line of cases beginning with *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), limiting the use of evidence of "other crimes." Also challenged is the trial court's denial of a severance motion. We find no error[1] and affirm.

### I: The Facts

The two appellants were convicted in a joint jury trial of premeditated first-degree

---

**1.** We have examined appellants' remaining arguments and find them meritless as well. The evidence was sufficient to convict Bullock as an aider and abetter. *Gayden v. United States*, 584 A.2d 578 (D.C.1990). The alleged hearsay testimony by Fields about the conversation with Smith was harmless in light of the mass of testimony about the offense. *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). We do not read the prosecutor's challenged remark as one that the jury " 'would naturally and necessarily take ... to be comment on the failure to testify.' " *Brewer v. United States*, 559 A.2d 317, 322 (D.C.1989) (citation omitted), *cert. denied*, 493 U.S. 1092, 110 S.Ct. 1163, 107 L.Ed.2d 1066 (1990). Finally, Bullock was not entitled to a manslaughter instruction in the absence of any evidence as to adequate provocation. *West v. United States*, 499 A.2d 860, 864 (D.C.1985).

murder while armed.[2] The decedent was Bernard Smith, who was shot by appellant James Johnson on a street corner the evening of January 16, 1988, immediately following a heated conversation between Smith and appellant Bullock.

Counsel for all parties and the trial court engaged in an extensive pretrial colloquy as to the extent to which the government could introduce evidence of the drug-related events leading to the killing. The trial court ruled that evidence could be admitted relating to the original drug transaction giving rise to the debt and to the demands for payment, but that no evidence could be presented that Bullock led a drug distribution organization or about the general rules of that organization, nor that Johnson was Bullock's lieutenant and enforcer.

Pursuant to this ruling, the following events were presented to the jury. In November of 1987, in a drug establishment called "Penny's," as Bullock stood by, Johnson handed "ten-packs" of heroin to Smith and the witness, Lenora Cole, to sell on the streets. Thereafter,[3] Smith sold heroin from a "ten-pack" to an acquaintance, Donald Fields, at the same time indicating to Fields a fear of Bullock—who was standing nearby during the transaction—and a desire to leave the drug-selling area without completing the sale of all of his drugs.

During the next two to three weeks, Bullock approached Fields and Cole on a daily basis, inquiring about Smith's whereabouts and mentioning that Smith owed him money. Bullock made increasingly hostile demands of Fields to relay his request for money to Smith until, on January 15, 1988, the day before the killing, Bullock told Fields that he was "tired of talking,"

that he wanted his money from Smith, and that Fields must transmit his demands to Smith. As Fields put it, Bullock's demands "went from I want to see him to tell him I don't have any rap for him, I want my money."

On January 16, 1988, the day of the murder, Fields told Smith about Bullock's demands. About an hour later Bullock arrived at 11th and O Streets where Smith was stationed. Bullock was with Cole, from whom he was also seeking money owed him from the sale of drugs. On the way to 11th and O, Bullock had asked Cole whether she had seen Smith, but she had lied and answered no. Just at that moment she saw Smith as she and Bullock neared the intersection, and they headed straight for him. As they approached Smith, Bullock ordered Cole to go around the block, find Johnson, and tell him to bring Bullock "his stuff." Cole left to do so.

Zanton Brown testified that just before the murder, Bullock had threatened her (Brown) while he had his hand on a pistol in his belt. He told her to move on or else he would "kill [her] ass, too." Frightened, Brown hastened away from the area. Linda Young stated that she heard Bullock threaten both Brown and Smith, demanding his money from Smith. According to Young, Bullock said to Smith: "He [presumably Fields] told me you was going to string me out. He said that but the time for talk is over now, man."

Cole returned to inform Bullock that she had seen Johnson, but that he could not get the "stuff" because "the dude wasn't there." Bullock, angered, ordered Cole to go back and bring Johnson to him, but she refused and went across the street to a liquor store. Meanwhile, Brenda Coates

---

2. D.C.Code §§ 22–2402, –3204 (1989). Johnson was convicted as the gunman, and Bullock on an aiding and abetting theory. Johnson was also convicted of carrying a pistol without a license in violation of D.C.Code § 22–3204 (1989).

3. When Fields testified that he encountered Smith in December, an extensive colloquy ensued among the parties concerning whether this was the same day Smith had received the drugs from appellants, previously identified as occur-

ring in November. Defense counsel for Bullock argued to the trial court that it should not permit any testimony regarding Smith's drug-selling in December since the court had previously limited such testimony to the November episode. However, the trial court ruled the evidence admissible, with the opportunity for cross-examination, since Fields' testimony would not involve "where Mr. Smith got his drugs on that day or some prior day," and would be "narrow and tailored to that day...."

approached Smith and Bullock intending to buy drugs from Smith, and heard Bullock demanding from Smith his "damn money" because Smith had "told [Bullock] the previous week that he would pay him and he ha[d]n't paid him...." Bullock yelled at her to leave him and Smith alone, and Coates went across the street to stand in front of the liquor store. Coates, Young, Brown, Cole, and Fields all testified that they could hear Bullock yelling at Smith.

Coates testified that when she was over near Bullock, she had seen Johnson at the corner of 11th and O standing near the wall of a television shop. Fields, in an alley off 11th Street, stated that he also saw Johnson standing nearby during the altercation between Bullock and Smith. Fields testified that after Bullock threatened Smith, he saw Smith turn and begin to walk away from Bullock. As Smith turned, Johnson, the gunman, told Bullock to "step back." Fields saw Bullock step back and raise his arm above his head. Johnson pulled a gun "from his coat" and fired at Smith, who flinched, turned back toward Bullock, and fell on the ground.

Johnson walked quickly away with his gun in hand. Bullock also walked off the way he had come, down O Street. Cole went to Smith's aid and saw that he had been shot. She stated that when she saw Bullock a few days later, he castigated her for coming to Smith's aid after the shooting. A few days after the murder, Fields saw a .38 caliber snub-nosed revolver in Bullock's car which was "almost alike" with the one he saw Johnson wielding the day of the murder.

Neither appellant testified at trial, instead asserting a general denial.[4]

## II: *Drew* Evidence

The central issue raised by both appellants concerns the scope of admission of evidence pertaining to the drug operation and the drug debt which precipitated the murder.[5] The trial court entertained the government's motion to admit such evidence by separating all of the proposed evidence into categories A through E, and, as mentioned above, admitting some but not other evidential categories. The court did not permit the introduction of evidence from Category A (evidence that Bullock led a drug distribution organization and the operating rules of the business) or Category B (evidence that Johnson was the lieutenant and enforcer of the organization).[6] The court did, however, admit evidence from Category C ("the dispute over the heroin sale in November and whether payment was made for it and follow-up attempts to obtain payment for it"), Category D (evidence that it was Johnson who shot Smith while Bullock aided and abetted),[7] and Category E (evidence that a gun similar to that used to murder Smith was seen in Bullock's car a few days after the murder). The trial court reaffirmed its commitment to this plan for admission of *Drew* evidence at various points in the trial, al-

4. Bullock, however, introduced a letter written by Cole in response to offers of assistance to her in jail from Bullock.

5. At oral argument, for the first time, counsel for Bullock asserted that the trial court never explicitly found that the other crimes had been proven by clear and convincing evidence. *See Holmes v. United States,* 580 A.2d 1259 (D.C.1990); *Groves v. United States,* 564 A.2d 372, 374 (D.C.1989), *modified on reh'g on other grounds,* 574 A.2d 265 (D.C.1990). Defense counsel never specifically asked the trial court to make such findings at the time of the ruling, and hence our review is for plain error. "Had counsel requested that the trial court make a clear and convincing finding, it could well have responded by doing so, as indeed it may have in fact done *sub silencio....* In sum, on this record, we simply could not say that the trial court's failure to *sua sponte* make an explicit finding of clear and convincing evidence led to a 'miscarriage of justice.'" *Lewis v. United States,* 567 A.2d 1326, 1331 (D.C.1989) (footnote and citation omitted).

6. The court explicitly determined that the prejudicial effect of Category A and B evidence outweighed its probative value: "[F]or a jury to hear long, detailed and undoubtedly fascinating evidence about the details of the internal workings of a sophisticated drug distribution organization would be so prejudicial that I don't think they could ever focus on whether these two defendants were involved in a shooting on the night in question...."

7. The court said, correctly, that such evidence is not *Drew* material at all but rather "comes in as evidence of the offense[s]" charged.

though it amended the scope of the permissibly admitted evidence within Category C as the trial proceeded and objections or motions for mistrial were made.[8]

### A: *The Motive Exception*

 The court allowed the government to introduce the evidence falling within the strictures of Category C under the motive theory of exception to the introduction of *Drew* testimony.[9] Although evidence of uncharged crimes and misconduct in the nature of criminal action are generally "inadmissible to prove predisposition to commit a certain type of crime, from which the jury might infer that the defendant committed the crime charged," *Harper v. United States*, 582 A.2d 485, 489 (D.C.1990), such evidence is admissible when relevant to prove, *inter alia*, that the offender had a motive to commit the charged offenses. *Green v. United States*, 580 A.2d 1325, 1328 (D.C.1990); *Bigelow v. United States*, 498 A.2d 210, 213 (D.C.1985). "[T]he other crimes evidence must be directed to a genuine, material, and contested issue in the case" and "must be logically relevant to prove this issue for a reason other than its power to demonstrate criminal propensity." *Roper v. United States*, 564 A.2d 726, 731 (D.C.1989); *Ali v. United States*, 520 A.2d 306, 310 (D.C.1987). Moreover, "[w]hether an issue has been raised for purposes of receiving other crimes evidence depends upon both the elements of the offense charged and the defense presented." *Willcher v. United States*, 408 A.2d 67, 75 (D.C.1979) (citations omitted). Even if the *Drew* material fits within an exception such as motive, "the trial court may not allow it in evidence unless the court finds its probative value outweighs the prejudicial impact." *Jefferson v. United States*, 587 A.2d 1075, 1078 (D.C.1991). The determinations of relevance, materiality and whether probativeness outweighs prejudice are committed to the sound discretion of the trial court, and will not be overturned on appeal absent an abuse of that discretion. *E.g., German v. United States*, 525 A.2d 596, 607 (D.C.), *cert. denied*, 484 U.S. 944, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987). In this case, the trial court, in explicitly exercising its discretion, concluded that the Category C evidence was directly relevant

---

**8.** The most significant reinterpretation or curtailment of the Category C evidence was the court's midtrial determination, upon Bullock's motion for mistrial, to instruct the jury that any drug-related testimony from the current witness, Lenora Cole, that strayed from the November heroin distribution to herself and Smith, or the January 16, 1988, murder date, "has nothing to do with this trial ... and should be totally disregarded." The trial court failed to give its contemplated jury instruction, apparently because Bullock's counsel complained that no instruction could "cure" the error or "disabuse" the jury of the information, and Johnson's counsel made no further objection to the failure. Indeed, the record does not reveal that either appellant requested the trial court to give the standard *Drew* evidence jury instruction. *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA No. 2.49 (3d ed. 1978). Thus, although "the general rule is that the trial court must instruct the jury as to the limited purpose for which such [misconduct or other crimes] evidence is admitted," we review the failure to so instruct here for plain error. *See (Edward) Green v. United States*, 440 A.2d 1005, 1007–08 & nn. 6–8 (D.C.1982). We find no such plain error here, where there was such overwhelming independent eyewitness evidence of the offenses and where the evidence admitted did not relate to entirely discrete other crimes.

**9.** The trial court made clear that it intended to circumscribe the scope, not the amount of evidence that could come in under the Category C rubric:

You [the government] have to be able to show, for purposes of the motivation for this offense, that there was not just a street sale to Mr. Smith and he didn't pay, but, rather, that there was an agreement as to how Mr. Smith was going to dispose of these drugs and then make the payment, but that doesn't mean that this whole organization comes in, because it is the fact of this sophisticated drug organization that would irreparably and unduly prejudice the jury against the two Defendants in this case.

The court also mentioned several specific types of evidence that could come in under this category, including all evidence of: the November or December distribution to Cole, Fields, or Smith; the rules pertaining to the prospective sale of the drugs; and whether or not Smith left "his block" or sold "as many packets as he was supposed to under the rules, that is, he was supposed to sell ten packets, because that's part of the drug sale and that's part of the dispute over the drug sale."

to proving appellants' motive in committing the offenses with which they were charged, and that the evidence was more probative than prejudicial.

 Both appellants claim that the evidence was inadmissible under the motive exception because no affirmative defense was presented and motive was not an element of the charged offenses. However, as we have made clear in several recent opinions, no affirmative defense need be pleaded nor must motive constitute an element of the offense charged to permit admission of motive evidence where the defendant generally denies committing the offense and the evidence helps to establish the identity of the defendant as the offender. *Hill v. United States*, No. 89–639, slip op. at 6–8 (D.C. May 30, 1991), and cases cited; *Green, supra*, 580 A.2d at 1328 (evidence of prior uncharged altercations between accused and decedent admissible because "highly relevant to the issue of identity"). The rationale is that

> motive evidence which suggests the identity of a murderer is not dependent on the nature of the defense ... for the particular defense that a defendant elects to present cannot make admissible evidence inadmissible. Rather, the case law makes clear that the admissibility of evidence such as that at issue here depends on the identity of the parties, *i.e.*, on the fact that the defendant had a motive to harm this particular victim, with whom he already had an established relationship.

*Hill, supra*, slip op. at 8. Moreover, there is no requirement that the facts of the uncharged and charged crimes bear substantial similarity, because the motive exception where identity is at stake is broader than the independent identity exception to *Drew*, and permits "evidence of past hostility between the defendant and the victim to be admitted as proof of a motive to commit the particular hostile act against the same victim...." *Id.*, slip op. at 9.

The motive evidence need not consist solely of hostile or violent acts; other types of evidence are similarly admissible as long as they are relevant to proof of a motive for the crime charged and demonstrate "that the defendant's prior criminal conduct was directed toward the same victim." *Id.* We therefore perceive no error in the trial court's admission of the Category C evidence pursuant to the motive exception to *Drew*.

### B: *Scope of the Ruling*

Appellants also contend that even if the motive evidence was permissible as initially contemplated by the trial court, their mistrial motions should have been granted because the drug evidence which actually came in exceeded the narrowly drawn category dictated by the *in limine Drew* ruling, in effect becoming proscribed Category A and B material.[10]

 Appellants objected to government questions to Cole about her first meeting with appellants before the distribution at Penny's in November. After the court overruled the objection, the witness testified that she had seen the appellants in Penny's on an earlier occasion when she had come in to use drugs there, and that on the November distribution day Bullock gave out "testers" (samples of the drug) and returned later seeking "runners" (drug dealers). Both appellants moved for a mistrial, which the trial court denied, ruling instead that the testimony was "still within the rules" set down earlier for Category C evidence because the tester-runner testimony concerned the same November occasion, and thus was previously contemplated as coming within the purview of Category C.

Later in Cole's testimony, both appellants again moved for a mistrial when Cole broadly intimated that she had dealt drugs for appellants at times other than the November occasion. The trial court, apparently believing the testimony that had already come in was harmless, if it had ex-

---

**10.** In addition to an implied general objection to the *in limine* ruling, both appellants expressly objected at a number of points in the trial to the scope of the material allowed into evidence as Category C material. We assume, without deciding, the correctness of the exclusion of the category A and B material.

ceeded the scope of Category C at all, dealt with the motion by proposing to give the jury a cautionary instruction, which appellants considered unhelpful and urged the court not to give. *See supra* note 8.

Appellant Bullock additionally argues that a mistrial should have been granted in at least five other circumstances involving *Drew* evidence of drug dealing going beyond the scope of the trial court's *in limine* ruling. The evidence at issue included statements that Cole "work[ed]" for Bullock; that Bullock handed a witness "bundles"; that Smith was told he was not to leave the block until he sold all of his heroin; that Bullock told Brown to give him his "shit"; and that Cole owed Bullock money for two packages of heroin. Finally, at oral argument, Bullock's counsel highlighted as prejudicial testimony that Bullock had a certain block whose drug business he solely controlled.

■ The trial court has broad discretion in deciding whether to grant or deny a mistrial motion, and we will not overturn its determination unless it is "unreasonable, irrational, or unfair" or "the situation is so extreme that failure to reverse would result in a miscarriage of justice." (*Charles*) *Lee v. United States*, 562 A.2d 1202, 1204 (D.C.1989). We cannot see any abuse of that wide discretion in the instances advanced by the appellants on appeal.[11]

In almost all of the situations presented, either the objections were sustained;[12] the evidence was well within the Category C limits according to the trial court's discretionary judgment; or the admission was not objected to and hence reversible only for plain error, which we find appellants could not show here, *cf. Hill, supra,* slip op. at 11 (no plain error where properly admissible *Drew* evidence "took up almost half of the trial"). With the principle established that the drug-related activity evidencing the motive leading to the killing might be put to the jury, occasional slippage in the scope of that evidence cannot be deemed so prejudicial as to mandate the granting of a new trial, as argued here.[13]

### C: *The Post–Murder Gun Sighting*

■ We also uphold the trial court's *in limine* decision to admit Fields' testimony that he had seen a gun in Bullock's car several days after the murder. Even assuming that possession of a .38 revolver like that at issue here would pass the threshold requirement that it constitutes evidence of crime or wrongdoing, *cf. Jones v. United States*, 477 A.2d 231, 237–38 (D.C.1984) (mere possession of .38 revolver, without more, not wrongful conduct and thus not *Drew* evidence), the evidence was properly admitted under (*Ronald*) *Lee v. United States*, 471 A.2d 683 (D.C.1984) and

11. We do not agree with appellant Johnson that the trial court "expressly prohibited" or failed to authorize the government to present any evidence of Johnson's involvement in the drug operation. The trial court's decision to admit other crimes evidence falling within the narrowly circumscribed Category C confines did not limit the drug evidence to that implicating only Bullock; rather, it only purported to limit the evidence to that pertaining to the November drug distribution to Smith and efforts *by both appellants* to recover their money for it, since all such evidence would prove both appellants' motives to commit murder in January.

12. The trial court sustained all objections that it considered to go beyond the *in limine* plan.

13. The difficult discretionary task faced by the trial court was to admit sufficient evidence so that the jury could fairly understand the background and motivation of the crime itself without unduly prejudicing the appellants through the introduction of unnecessary details. That the trial court was aware of this responsibility is

clear: "I'll have to be particularly careful about what comes in and so will counsel, and I'll hear objections when they're pertinent." In a sense, what is at stake is presenting to the jury an adequate, but not prejudicially excessive, "explanation of the surrounding circumstances of the crime," which the standard criminal instructions have recognized as a *Drew* exception. CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA No. 2.49(g) (3d ed. 1978). Our case law is unclear with respect to the circumstances under which such evidence may be admissible under *Drew*. As we recently pointed out, such evidence may come in without any limiting instruction only where it has a "close temporal relationship" with the crime itself. *Parker v. United States*, 586 A.2d 720, 724 (D.C.1991). Such contemporaneous evidence, introduced without the *Drew* safeguards, might be referred to as "pure" *Toliver* evidence. *Id.* at 724 n. 6, citing *Toliver v. United States*, 468 A.2d 958, 961 (D.C.1983).

*(Abdus–Shahid M.S. ) Ali v. United States,* 581 A.2d 368 (D.C.1990).

*Lee* upheld the introduction in evidence of a knife, found in a defendant's car sixteen hours after the complainant was raped, on the theory that it was evidence of the crime charged and thus not *Drew* other crimes evidence at all. Here, Fields gave testimony that the gun looked like the one he saw Johnson use to murder Smith. As in *Lee,* where the knife was held admissible despite its significant difference in length from the knife described by the witness, reversible error does not lie here simply because Fields contradicted himself and could not state that the gun in the car was the actual gun used in the murder.

Similarly, in the more recent case of *(Abdus–Shahid M.S.) Ali v. United States, supra,* 581 A.2d at 375, we reaffirmed this proposition, holding that any uncertainty that the gun as identified by a witness was the same one used by the appellant in the charged offense "would go to the weight of the evidence rather than its admissibility." There, the appellant argued that admission of photographic and other evidence concerning his possession a month before the charged murder of a sawed-off shotgun, allegedly similar to the murder weapon, violated the principles of *Drew.* We held that even though some of the evidence depicted appellant's possession of the gun as unconnected with the murder, other evidence supported the inference that appellant's possession was related to the murder and hence not just to an independent crime. Thus, we said, the photographs and other evidence "constituted evidence of the crime charged," *id.* at 377, and were not subject to *Drew.* The same is true here, especially where the gun was found only a few days, not a month, from the charged offense.

### III: Severance

■ Johnson argues that the trial court should have granted his motion to sever because the admission of the other crimes evidence against Bullock would not have been admissible against him in a separate trial and therefore prejudiced him. "When two or more persons are charged with jointly committing a criminal offense, [however,] a strong presumption arises that they will be tried together." *Tillman v. United States,* 519 A.2d 166, 169 (D.C.1986). Hence, this court will reverse a denial of a severance motion "only upon a clear showing that the broad discretion accorded the trial court in this regard has been abused. To demonstrate that the trial court abused its discretion in denying their severance motions, appellants must show not simply that they were prejudiced, but that they suffered 'manifest prejudice' from the joinder of the case." *Payne v. United States,* 516 A.2d 484, 489 (D.C.1986) (citations omitted). An appellant does not suffer such prejudice "merely because a significant portion of the government's evidence admitted at trial is applicable only to his codefendants. This is so even though some of the evidence concerns prior criminal offenses or bad acts relating only to other codefendants." *Id.* at 490 (citations omitted). The inquiry, therefore, is only "whether the evidence presented is so complex or confusing that the jury would be unable to ... make individual determinations about the guilt or innocence of each defendant." *Id.*

Johnson has not made such a showing of manifest prejudice. His argument fails because the drug debt evidence admitted would have been equally admissible against Johnson in a separate trial, and the trial court did not rule to the contrary. Johnson had a substantial connection with the prior drug transaction and efforts to collect the debt since the evidence showed he was the distributor to Smith; thus, the evidence was relevant and probative of Johnson's motive to shoot Smith. Even if some of the evidence would not have been admissible against Johnson, we have held that "[s]everance is not required merely because evidence would be admissible against one defendant and not the other or because evidence against one defendant is more damaging than the evidence against the other." *Cunningham v. United States,* 408 A.2d 1240, 1243 (D.C.1979); *accord, Payne, supra,* 516 A.2d at 490–92; *Christian v. United States,* 394 A.2d 1, 20 (D.C.1978); *United States v. Mack,* 151 U.S.App.D.C.

162, 166, 466 F.2d 333, 337 (1972) (severance unwarranted where evidence admissible against both principal and aider and abettor of murder). There was simply no evidence that the jury could not make individual determinations about the guilt or innocence of each individual appellant. Moreover, at no time did Johnson request that the court give a limiting instruction permitting the jury to consider the drug evidence only against Bullock. We can find no abuse of the trial court's broad discretion in making severance determinations.

*Affirmed.*