Bradley K. SWEET, Appellant,

v.

UNITED STATES, Appellee.

No. 94–CF–191.

District of Columbia Court of Appeals.

Argued Oct. 27, 1998.
Decided May 25, 2000.

Mindy A. Daniels for appellant.

Ann L. Rosenfield, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, and Thomas J. Tourish, Jr., Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and SCHWELB, and REID, Associate Judges.

WAGNER, Chief Judge:

Following a jury trial, appellant, Bradley Sweet, was convicted of two counts of assault with intent to kill while armed (AW-IKWA) (D.C.Code §§ 22–501, –3202 (1989)), two counts of possession of a firearm during the commission of a crime of violence (PFCV) (D.C.Code § 22–3204(b) (1989)), two counts of carrying a pistol without a license (D.C.Code § 22–3204(a) (1989)), one count of first-degree murder while armed (premeditated) (D.C.Code §§ 22–2401, –3202 (1989)) and two counts of obstruction of justice (D.C.Code §§ 22–722(a)(3), –722(a)(1) (1989)). These charges arose out of an assault on Marcia Watson and her nephew, Edgar Watson, on October 17, 1991 and the subsequent murder of Marcia Watson on November 29, 1991. In the same trial, Sweet was also convicted of multiple offenses in a consolidated case related to the murder of a corrections officer, Ronald Richardson, on October 7, 1991. The offenses for which he was convicted in the Richardson case included conspiracy to commit first-degree murder while armed (premeditated) and felony murder while armed

(D.C.Code §§ 22–2401, –3202), obstruction of justice (D.C.Code § 22–722(a)(1)), assault with intent to commit obstruction of justice while armed (D.C.Code § 22–722(a)), possession of a firearm during the commission of a crime of violence, and carrying a pistol without a license.[1] Sweet argues for reversal on the grounds that the trial court erred in: (1) permitting the government to introduce other crimes evidence that he was a hit man who had committed prior murders at the behest of co-defendant, Tony Hammond; (2) denying severance of improperly joined charges; (3) denying his motion to suppress statements; (4) precluding the admission of decedent, Marcia Watson's hearsay statements which exculpated Sweet and implicated someone else; (5) improperly admitting hearsay statements of his co-defendants as declarations against penal interest; and (6) amending the indictment by use of a verdict form which broadened the charges. Sweet also contends that various offenses merge, an argument which the government concedes in part. We reverse and remand for a new trial on the grounds that Sweet was substantially prejudiced by the improper admission of other crimes evidence.

## I. *Factual Background*

### A. *The Richardson Murder*

On October 7, 1991, Ronald Richardson, a corrections officer, was scheduled to testify as a complaining witness in the trial of Michael Page, who was charged with kidnaping two correctional officers, including Richardson, from a halfway house. Richardson was gunned down in front of his home as he left to meet with the prosecutor on the morning of trial. His daughter heard about a dozen shots, and from her window, saw three men in the middle of the street, one of whom stuck a gun down his pants. She observed the men enter a

---

1. Sweet was charged in the indictment for Richardson's murder along with co-defendants, Navarro Hammond (Tony), Chester Wright (Man), Terrence Pleasant (Terry), and Michael Page. The co-defendants' motion to sever was granted by the trial court, and Sweet was tried separately.

burgundy colored Dodge Caravan, which was parked in front of her father's car, and drive away. She spotted her father on the ground and called the police. Richardson had sustained multiple gunshot wounds from which he died.

Eric Pleasant, co-defendant Terry Pleasant's cousin, read about Richardson's murder in the newspaper and recognized the name of Michael Page in the account.[2] Eric had seen his cousin, Terry, with Tony Hammond, Chester Wright and Sweet, and he had associated with them occasionally. Shortly after Richardson's murder, Terry informed Eric that "we got one around your way," which Eric understood to mean that they had murdered someone. Eric asked Terry if he was referring to the corrections officer, and Terry responded, "Yeah." Eric knew that Terry drove a burgundy Caravan at the time of the murder, and later Terry informed Eric that he had driven the car to the scene of the murder. Eric knew a police deputy chief and spoke to him later about the crime. The deputy chief had Eric "debriefed" by Detective Will. Detective Will conveyed information about the case to Detective Gregory who applied for a warrant for Terry Pleasant's arrest. Terry Pleasant was arrested the next day. After his arrest, Eric spoke with Chester Wright who informed him that Terry should be home soon because he did not kill Richardson. When Terry was released from jail, Eric spoke to him about the comment. Terry responded, "Man, Chester Wright and Bradley [Sweet] better take their beef, because he wasn't going to take it."

## B. The Assaults on Marcia Watson and Edgar Watson

The evidence showed that on October 17, 1991, shortly before 8:00 p.m., Edgar Watson, the fourteen-year-old nephew of Marcia Watson, saw his aunt in the area of Stanton Terrace speaking to Sweet. Terry Pleasant, who was also in the area, talked to Edgar Watson. Edgar did not hear the conversation between Sweet and his aunt, but she told him afterwards that it was about money she owed Sweet. Edgar remained on the street with his aunt, who was "hustling." Later, Sweet returned to the area and shot Marcia and Edgar Watson. Edgar ran. As he looked back, he saw his aunt cover her head as Sweet stood over her shooting. A man who lived in the area, who knew Marcia Watson, heard the shots and saw her kneeling by a car. He also heard her crying out, "Why you all doing this to me, Bradley." Marcia and Edgar were taken to the hospital. Ballistic tests determined a bullet recovered from the Marcia Watson shooting was fired from the same weapon as a bullet recovered in connection with the Richardson homicide. Her sister, who was visiting, asked who shot her, and Watson, who had tubes in her mouth, wrote on a piece of paper that "Bradley shot me. Don't tell." When she was able to speak, Marcia Watson stated repeatedly that, "I know I'm going to die."

While she was still in the hospital, Marcia Watson told police Detective Giardino that Sweet shot her and her nephew, and she identified Sweet's photograph from a photo array that the detective showed her. She gave the detective a written statement in which she explained that Sweet was angry with her because she owed him money for drugs and that he had discussed it with her before the shooting. In her statement, Marcia Watson described how a bullet struck her causing her to fall, how Sweet stood over her smiling, his face illuminated by the streetlight, and continued shooting her in the face even though she was begging him for her life. Edgar Watson identified Sweet's photograph as looking like the person who shot him. Sweet was arrested on November 4, 1991 in connection with the Watson shootings.

2. Since the Pleasants have the same last name, for convenience, they are referred to sometimes in this opinion by their first names.

## C. *The Murder of Marcia Watson*

On November 27, 1991, Marcia Watson spoke with police Detective Linda King, whom she encountered on the corner of Stanton Terrace and Alabama Avenue. Ms. Watson informed King that she had some information about "everything that's going on in Stanton Terrace." They arranged to meet the following day. When Ms. Watson came into the area the next day, she spotted someone and left hurriedly. The following day, November 29, 1991, Marcia Watson and Selenna Winston went to a corner on Stanton Terrace to sell drugs. When they reached Stanton Terrace and Frederick Avenue, Watson remarked that she did not know why she was standing there because it was where she had been shot. Watson then saw Sweet approaching and said, "Oh, my God, not again." Winston testified that she saw Sweet run up to Marcia Watson and shoot and kill her.

Kevin Watson, Marcia Watson's cousin, and Kevin Frye were arrested in connection with this murder. After his arrest, Kevin Watson provided information to the police about the Richardson murder. He said that while at Terry Pleasant's house one Saturday in October 1991, Tony Hammond, with whom his sister, Michelle Watson was involved in selling drugs, pressed them to confirm an address and license plate at 58th and Blaine Streets. That was the location where decedent Richardson lived and was later killed. According to Kevin Watson, Pleasant had given Hammond a piece of paper with the address on it just before Hammond made the request. Kevin and Michelle Watson went to that location and confirmed the information. The next Monday, Kevin Watson learned about the murder of the corrections officer at that location. Hammond later admitted to him that as soon as he and Michelle confirmed the information, Hammond "and his man" staked out the location and waited all day Saturday and Sunday for the officer. Kevin Watson said he was present with Terry Pleasant and Michelle Watson later when Sweet described how he and Chester Wright had shot Richardson. Kevin Watson also testified that he spoke with his cousin Marcia Watson about the murder before she was shot on October 17, 1991.

While in jail, Sweet admitted to Kevin Frye that he shot Marcia Watson because she knew about some homicides, and she was on drugs and might talk. Sweet described to Frye how he shot Marcia Watson. He also told Frye that he took a "bet" from Tony Hammond to kill the corrections officer and that a lawyer had provided the officer's address. Hammond described for Frye the details concerning how they laid in wait for the officer in shifts. Sweet told Frye that he "popped [Richardson] a tune," meaning that he murdered him.

Michelle Watson testified that she overheard Sweet describe how he and Chester Wright murdered the corrections officer. Two days after the murder, she heard Sweet bragging to Terry Pleasant about his role in the murder. Sweet said he shot Richardson in the body and that Wright shot him in the head. Michelle Watson also said that Tony Hammond told her that Sweet and Chester Wright killed the corrections officer, and Hammond went to the scene after the shooting and saw them there, along with Wright. Hammond said that he knew it would be done right because Sweet was with them. Michelle Watson also spoke with Chester Wright who described where he and Sweet had shot Richardson, which was consistent with Sweet's account.

## II.

Sweet argues that the trial court erred in admitting other crimes evidence. Specifically, he contends that the trial court erred in allowing the government to introduce his admission that he had "crushed" (killed) people before for Tony Hammond. He argues that the trial court failed to make the requisite findings for admission of this other crimes evidence under *Drew*

*v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), and provided no cautionary instruction for the evidence, which he contends was more prejudicial than probative. Relying on *(William) Johnson v. United States*, 683 A.2d 1087 (D.C.1996) (en banc), *cert. denied*, 520 U.S. 1148, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997), the government argues that the challenged evidence was not subject to the strictures of *Drew* because it was admissible as substantial proof of the crime charged or so closely intertwined with evidence of the crime charged as to be admissible.

■ Other crimes evidence is inadmissible to prove that a defendant was predisposed to commit the crime charged, and such evidence is deemed presumptively prejudicial unless it can be shown to be admissible for a substantial and legitimate purpose, including for example, motive, intent, absence of mistake or accident, common scheme or plan or identity. *Johnson, supra*, 683 A.2d at 1092 (citing *Drew, supra*, 118 U.S.App.D.C. at 15–16, 331 F.2d at 89–90). Even if this test is met, the evidence should be excluded "if the danger of unfair prejudice that it poses substantially outweighs its probative value." *Id.* at 1101 (citing *United States v. Conners*, 825 F.2d 1384, 1390 (9th Cir.1987)). However, relevant evidence of other crimes is not subject to the *Drew* analysis when "the evidence is direct proof of the crime charged, [and] it must surmount only the final hurdle that all evidence of whatever sort must clear, *i.e.*, the evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice it poses." *Id.* (citing *Drew*, 118 U.S.App.D.C. at 16, 331 F.2d at 90). Here, the trial court indicated that it did not view this evidence as subject to a

*Drew* analysis, apparently accepting the government's argument that the evidence explained why one of the alleged co-conspirators in the murder of the corrections officer approached Sweet to commit the offense.[3] On appeal, the government does not argue the admissibility of the evidence under *Drew* and its progeny. It takes the position that the evidence was admissible under *Johnson, supra*, "either as direct and substantial proof of the charged crime or as closely intertwined with the charged crime."

Sweet was charged, along with Tony Hammond, Terrence Pleasant and Michael Page, with conspiracy to commit first-degree murder while armed of Ronald Richardson and obstruction of justice to prevent Richardson from testifying as a complaining witness in the case of *United States v. Michael Page*, No. F 326–91, which was scheduled for trial in Superior Court the morning that Richardson was killed. At one time the police thought that Sweet was a witness, rather than a participant in Richardson's murder, and in an interview, Sweet told the police that Hammond and Pleasant had tried to solicit him to commit the murder.[4] When the detective asked Sweet why they had tried to solicit him to commit the murder, Sweet responded to that he had "crushed [killed]" for Hammond before. On appeal, Sweet challenges the admission of this evidence through the testimony of a police detective at trial as well as the prosecutor's remarks concerning it in opening statement and closing argument. In opening statement, the prosecutor included in his remarks the following:

> You're going to listen and hear the witnesses in this case describe how this

---

3. In explaining the evidence which the government sought to elicit about Hammond's solicitation of Sweet to murder Richardson, the prosecutor explained to the court that the government has no interest in bringing out any other murders that Bradley Sweet did except for the purpose of his own description of why they came to him and

asked him to do the hit, because he had done this kind of thing before for them. And so he was the logical person that they would go to this time.

4. At the time, Sweet was attempting to persuade the police to get the charges dropped related to the first shooting of Marcia Watson.

investigation unfolded and how we will know at the end of this trial that Bradley Sweet was a hit man, a paid killer to do this job.

* * * *

One of Tony Hammond's closest associates was Terrance Pleasant. Another associate was Chester Wright and another close associate is ... Bradley Sweet. Brad Sweet said that Tony Hammond was willing to put up $20,000 and a kilo of cocaine to kill the corrections officer. Terry Pleasant, according to Bradley Sweet, had come to Bradley and asked him to do the murder. Bradley called it a bet. Will you take the bet? Bradley said the reason they came to [him] is because I've crushed for Tony before and so he knew that I would get the job done.

Detective Gregory testified at trial that Sweet told him that Pleasant and Hammond had offered him $20,000 and a large amount of cocaine to "take a bet" to kill the correctional officer, and Sweet explained that a bet was a contract to kill someone. According to the detective's testimony, when he questioned Sweet about why Pleasant and Hammond would come to him, Sweet explained that he had "crushed [meaning kill] for them before." The officer also stated that Sweet said that he turned the offer down because there would be too much heat for killing a cop. In response to questioning by defense counsel concerning how he remembered the conversation without notes, the detective explained that it was the first time as a detective that anyone had told him that he had killed before. The prosecutor summarized this evidence in closing argument:

> You know from the testimony of Detective Gregory that this man is a self-proclaimed hit man that he crushes people for Tony Hammond; that that's what he used to do. And you know he used to do that until he was finally arrested in December of 1991 when he finally was locked up and held, ladies and gentlemen. And he admitted to Detective Gregory, of course, they came to me because I used to do this kind of thing for them all the time. I crushed for Tony Hammond. That's what I do. But this one was too hot. I didn't want to do it and then he went into a detailed description of how this murder actually occurred.

The trial court concluded, and the government argues on appeal, that this evidence does not fall within the strictures of *Drew*. *Drew* is inapplicable ... where the "'evidence (1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context.'" *Bonhart v. United States*, 691 A.2d 160, 164 (D.C.1997) (citing *Johnson, supra*, 683 A.2d at 1098). "While it is the general rule that a confession to be admissible must relate to the offense charged, it is equally true that it may include other offenses when there can be no separation of the relevant and irrelevant parts or when 'the two crimes are so connected as to be part of a general scheme.'" *Settles v. United States*, 615 A.2d 1105, 1109 (D.C.1992) (quoting *Robinson v. United States*, 61 U.S.App.D.C. 370, 371, 63 F.2d 147, 148, *cert. denied*, 289 U.S. 749, 53 S.Ct. 697, 77 L.Ed. 1494 (1933)) (quoting *Borum v. United States*, 61 U.S.App.D.C. 4, 6, 56 F.2d 301, 303, *cert. denied*, 285 U.S. 555, 52 S.Ct. 459, 76 L.Ed. 944 (1932)) (other citations omitted). Relying primarily on *Johnson, Bonhart* and *Settles*, the government contends that Sweet's statements concerning his involvement in prior crimes with his co-conspirators was closely intertwined with the charged offense and necessary to place the offense charged in context, and therefore, not subject to the requirements of *Drew*. However, in each of the cases relied upon by the government, unlike the case before the court, the relationship of the statements to the charged offense makes their admissi-

bility readily apparent as a brief review of each will show.

In *Johnson,* the appellant was convicted of killing his partner in a drug operation. 683 A.2d at 1090. The decedent's keys and portable telephone were missing after the murder. Minutes later, calls were placed to a nearby Maryland apartment where decedent's son, girlfriend, and her brother resided and which was used as a production center for the narcotics operation. *Id.* at 1091. Less than one hour later, the apartment was entered without force, a pistol and drugs were taken from a closet, and the two boys were shot with the same weapon as decedent was. *Id.* at 1091, 1094. We held that *Drew* did not apply because "the evidence of the Maryland killings was such direct proof of appellant's guilt of the instant charge that the two occurrences could not be said to be independent of one another...." *Id.* at 1096. The evidence of the uncharged Maryland crimes fell into the non-*Drew* categories, *i.e.,* direct and substantial proof of the charged offense. *Id.* at 1098.

In *Bonhart,* the defendant was charged with felony destruction of property, arson, second–degree murder and felony murder, 691 A.2d at 161. He contended on appeal that the trial court erred in admitting other crimes evidence that he had sold drugs for years to the decedent who died in a fire which appellant had set. The other crimes evidence consisted of testimony that two days before the fire, defendant had threatened to burn the decedent's apartment down if he and his companion did not pay defendant the money they owed him for a recent drug sale. We upheld the admission of the evidence as falling within two of the non-*Drew* categories, *i.e.,* as evidence intertwined with the arson and as substantial proof of the crime charged. *Id.* at 164. The facts surrounding the drug dealing and debt were intertwined with the defendant's threat of arson, which he carried out two days later, and proof of his involvement in the crime.

Finally, in *Settles,* the defendant was convicted of second-degree murder while armed for shooting his twelve-year-old nephew. 615 A.2d at 1106. He challenged on appeal the admissibility of testimony concerning his drug use on the day of the murder under *Drew.* As to Settles' statements concerning his own drug use, we held that the admission of defendant's statements that he was high and "kinda mellow" at the time of the shooting was proper to explain the circumstances surrounding the charged offense. *Id.* at 1110. Settles' explanation of how he tried to shoot his nephew in the shoulder to wound him following an argument because he was nervous and high "is the type of contemporaneous evidence of the circumstances surrounding the charged offense that is properly introduced without the *Drew* safeguards as what might be referred to as "pure" *Toliver* evidence."[5] *Id.* at 1109 (citing *(James) Johnson v. United States,* 596 A.2d 980, 986 & n. 13 (D.C.1991), *cert. denied,* 504 U.S. 927, 112 S.Ct. 1987, 118 L.Ed.2d 585 (1992)). This challenged evidence was essential to the jury's understanding of Settles' explanation of his state of mind at the time of the shooting. *Id.* at 1110.

▮ The other crimes evidence which Sweet challenges here does not fall into any of the three non-*Drew* categories outlined in *(William) Johnson, i.e.,* direct proof of the crime charged, closely intertwined with the evidence of the charged offense, or necessary to place the crime charged in an understandable context. *See (William ) Johnson, supra,* 683 A.2d at 1098. Evidence that Sweet had killed other people in the past on behalf of Hammond was not direct proof that he killed or conspired to kill the corrections officer at Hammond's behest. *See id.* Nor was the evidence of past murders closely intertwined with evidence of the current conspiracy to murder Richardson. The prior murders about which Sweet boasted did

5. *See Toliver v. United States,* 468 A.2d 958, 961 (D.C.1983).

not purport to be related to, or connected with, the murder of the corrections officer. Finally, Sweet's statement that he had "crushed" before for Hammond was not necessary to the jury's understanding of the events surrounding the conspiracy to murder Richardson. According to the government's evidence, Richardson was murdered to keep him from testifying in the case against Michael Page. There was no evidence that these events were associated with any of the past killings which Sweet claimed to have undertaken on behalf of Hammond or any of the others involved. Conspiracy to murder Richardson, according to the evidence, arose out of Hammond's desire to silence Richardson as a witness in a case against Michael Page. Thus, the claimed prior murders about which Sweet boasted, were independent of the crimes charged and not necessary to prove them.

■ "The impropriety of admitting prejudicial evidence of a defendant's other crimes merely to prove criminal disposition is well recognized." *Bonhart, supra,* 691 A.2d at 164. "Since the likelihood that juries will make such an improper inference is high, courts presume prejudice and exclude evidence of other crimes unless that evidence can be admitted for some substantial, legitimate purpose." *(William) Johnson,* 683 A.2d at 1092 (citing *Drew, supra,* 118 U.S.App.D.C. at 15–16, 331 F.2d at 89–90). Absent any showing of any legitimate purpose for admission of the evidence either under *Drew's* exception or as non-*Drew* evidence, it is difficult to conclude that the evidence was not offered to prove predisposition to commit the charged offense. Indeed, that is the way the government used the evidence of Sweet's admissions to prior contract killings in opening statement and in closing

argument. The prosecutor identified Sweet as a "self-proclaimed hit man" who kills people for Tony Hammond, "who used to do this all the time" until his arrest. Absent any legitimate purpose, evidence that the accused murdered other people in the past at the behest of Hammond was highly likely to lead the jury to infer improperly that Sweet once again carried out the contract killing on behalf of Hammond for which he was on trial in this case. Even assuming that this evidence were relevant as non-*Drew* evidence, the danger of unfair prejudice would seem to outweigh any probative value.[6] *See (William) Johnson, supra,* 683 A.2d at 1099 (citing FED. R EVID. 403, now followed by this court). We conclude, therefore, that it was an abuse of discretion for the trial court to admit the evidence. This evidence lacked legitimate probative value and the danger of unfair prejudice was substantial, requiring reversal.

### III.

Since we reverse for the reasons stated in part II of this opinion, we address only those remaining claims which will arise upon retrial. First, Sweet argues that the offenses were misjoined. He contends that the joined offenses were not of the same or similar character, connected together nor a part of a common plan. Rule 8(a) permits joinder of offenses in the same indictment for a defendant which are "of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Super. Ct.Crim. R. 8(a). Sweet contends that the Richardson charges and Watson charges do not meet the test for joinder under Rule 8(a).[7] In

---

6. The trial court did not conduct an analysis of whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. Even if the evidence is relevant as direct proof of the crime charged and not subject to the requirements of *Drew,* it must still overcome this hurdle. *(William)*

*Johnson, supra,* 683 A.2d at 1101. The trial court is usually in a better position to make this assessment.

7. Sweet was tried separately from his co-defendants in the consolidated case involving the murder of Ronald Richardson. There is

support of this argument, he points out that the Richardson murder involved a planned assassination by three assailants outside the victim's home, while the Watson incident involved a lone gunman in a known drug distribution area.

[redacted] We start with the proposition that Rule 8(a) is construed broadly in favor of initial joinder. *Coleman v. United States,* 619 A.2d 40, 46 (D.C.1993) (citation omitted). The government argues that joinder was proper based upon that portion of the rule which permits joinder of crimes which are "connected together." "Two crimes are connected together within the meaning of the rule if 'proof of one crime constitutes a substantial portion of proof of the other.'" *Id.* (quoting *United States v. Montes–Cardenas,* 746 F.2d 771, 775 (11th Cir.1984)) (other citations omitted). Here, there was evidence that the same gun used in the Richardson shooting was used in the assault on Marcia Watson, who was later killed by the same man who had shot her once before. These circumstances demonstrate that the offenses are connected together within the meaning of the rule because of the overlapping of proof. *See id.* (proof that defendant possessed a knife which appeared to be used in two joined robberies overlapped with proof of charge of carrying a dangerous weapon); *Void v. United States,* 631 A.2d 374, 379–80 (D.C.1993) (evidence that fruits of one crime were used to carry out a later crime may be sufficient to meet the "connected together" requirement for joinder). There is a further connection in that the indictment alleges that Sweet's motive for shooting and killing Watson was to prevent her from providing information to law enforcement authorities concerning the Richardson murder. The evidence at trial showed that Sweet admitted to Frye that he had shot Watson and her nephew because Watson knew something about some homicides and that she might talk because of her drug problem. We conclude that there is a substantial connection between the charged offenses to support joinder under Rule 8(a).[8]

[redacted] Sweet argues that the offenses should have been severed under Super. Ct. Crim. R. 14 even if the offenses were properly joined. Rule 14 provides for relief from prejudicial joinder where the defendant or government would be prejudiced thereby. Under the rule, severance should be granted

> "unless (1) the evidence as to each offense is separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass, or (2) the evidence of each of the joined crimes would be admissible at the separate trial of the others."

*Void, supra,* 631 A.2d at 379 (quoting *Cox v. United States,* 498 A.2d 231, 235 (D.C. 1985)) (quoting *Bridges v. United States,* 381 A.2d 1073, 1075 (D.C.1977), *cert. denied,* 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978)) (other citations omitted). Sweet contends that the evidence of the crimes in the Richardson murder was not admissible for any legitimate purpose with respect to the other crimes. Specifically, he argues that: (1) the government did not need the evidence of the Richardson murder to establish motive or identity in the Watson incidents because of the availability of Watson's statements identi-

no challenge under Super. Ct.Crim. R. 8(b), which governs joinder of defendants in a single indictment.

8. The charges in this case might well qualify for joinder as crimes of the same or similar character. Offenses are considered to be of the same or similar character for purposes of joinder under the rule "where the counts in the indictment 'allege the same general kinds of crimes.'" *Roper v. United States,* 564 A.2d 726, 729 (D.C.1989) (quoting *Winestock v. United States,* 429 A.2d 519, 524 (D.C.1981)). The crimes involved here are of the same general type. Unquestionably, the murder charges and related weapons offenses have common elements, which is one of the factors for consideration in determining the similar character of the crimes. *See id.* at 730. The offenses against both victims were motivated by a desire to silence them.

fying him as the perpetrator and providing another motive for the shooting; (2) evidence that the same gun used to shoot Richardson and assault Watson initially was of minimal relevance because Watson had identified Sweet as her assailant in the unsuccessful murder attempt; and (3) the evidence was not admissible in separate trials.

■■■ Mutual admissibility of evidence in separate trials is determined generally by applying a *Drew* analysis. *Roper, supra,* 564 A.2d at 731. However, the *Drew* analysis is not required where the evidence is "not independent of the crime charged and the evidence is direct proof of the crime charged. . . ." *(William) Johnson, supra,* 683 A.2d at 1101. Here, evidence of the Richardson murder was related to the first attempt on Watson's life and her subsequent murder. There was evidence that Sweet admitted that he shot Watson because she had information about some homicides, and Sweet was afraid that she would talk. In addition, the weapon used was the same in the Richardson murder as in the subsequent initial shooting of Watson. Such evidence was direct proof of the Richardson homicide and the Watson shootings.[9] *See (Phillip H.) Johnson v.. United States,* 701 A.2d 1085, 1092–93 (D.C.1997); *see also Bonhart, supra,* 691 A.2d at 164.

■■■ Sweet also contends that any probative value of the evidence was outweighed by its prejudicial effect. The danger of unfair prejudice must be substantial to warrant the exclusion of relevant evidence. *(William) Johnson, supra,* 683 A.2d at 1099. That determination is left to the sound discretion of the trial court. *See (Phillip H.) Johnson, supra,* 701 A.2d at 1092–93. We find no abuse of discretion here. *See id.*

## IV.

Sweet argues that the trial court erred in denying his motion to suppress statements, including those he made to the police and before the Grand Jury, which he contends were obtained in violation of his Fifth and Sixth Amendment rights. He contends that the government obtained his testimony before the Grand Jury without providing him with warnings that he was a suspect. He claims that the government obtained statements related to the Richardson murder knowing that he was represented by counsel in the related Watson case and knowing that his motive for cooperation was to obtain a bargain in the Watson case with which he was charged.

The events which relate to this argument occurred as follows. Sweet was arrested on November 4, 1991 in connection with the assaults on Marcia and Edgar Watson. Sweet admits that he was given *Miranda*[10] warnings at the police station. At that time Detective Gregory, who was leading the investigation into the Richardson murder, tried to interview Sweet about it. However, Sweet declined, stating that he wanted the case involving the Watson charges dismissed in exchange. The detective informed Sweet that any deal would have to be made through the U.S. Attorney's office. The following day, Sweet was appointed counsel to represent him on the AWIKWA charges. Sweet again informed the detective that he would not talk about the Richardson murder unless the AWIKWA case was dismissed. Detective Gregory gave the same response that he gave earlier, adding that the U.S. Attorney would not even talk to him until he had provided information which could be verified. The detective further informed Sweet that he was not being arrested for murder and would not be ques-

---

9. We reject Sweet's argument that evidence that the victim, Watson, offered another or additional reason for Sweet attempting to kill her somehow eliminates the connection between the other evidence bearing upon the issue.

10. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

tioned about the AWIKWA charges. The detective again advised Sweet of his *Miranda* rights, and Sweet waived them. Sweet then told the detective that Terry Pleasant had approached him two days before the murder to kill the corrections officer to prevent him from testifying against Michael Page, a friend of Tony Hammond's. According to Sweet's statement, Hammond offered him $20,000 cash and a kilo of cocaine to do the job, but Sweet declined because there was too much heat in killing a corrections officer. The detective asked him why Hammond would make the request of him, and Sweet responded that he had "crushed" (killed) for Hammond before. Sweet then explained how Pleasant and Wright described how they killed Richardson and the weapons they used. He said that Terry Pleasant offered him some of the money afterwards because of their friendship.

The third contact occurred when Sweet was brought to meet with an Assistant United States Attorney who was prosecuting Terry Pleasant for the Richardson murder. Sweet provided the Assistant with the same information he had given to Detective Gregory, and Sweet testified before the Grand Jury, providing the same information previously given. Sweet was released on bond on November 18, 1991. Marcia Watson was killed on November 29, 1991. The next day, Detective Gregory contacted Sweet and requested his help in the case. Sweet said that he had seen a newspaper account about Watson's murder, and he was concerned that he would be arrested. The detective assured him that he would not be, and Sweet met with him. The detective did not advise Sweet of his rights at this time. Sweet told the detective that Tony Hammond and Chester Wright killed Watson to prevent her from talking to the police about the Richardson murder. On December 18, 1991, Sweet was arrested for the Watson murder. On January 8, 1992, the U.S. Attorney's office requested him to take a polygraph exam in connection with the Richardson murder

to clear himself. Although Sweet originally agreed to take the exam on January 29, 1992, he later refused to do so.

Sweet argues that once counsel was appointed for him, the government should have ceased communications with him unless his counsel was present. Although acknowledging that police are not barred from interrogating represented defendants in unrelated subsequently charged offenses, he contends that the police could not do so here without violating his Sixth Amendment right because: (1) his objective in providing the information was to secure dismissal of offenses charged in the case in which he was represented by counsel; and (2) the charged Watson case and the uncharged Richardson murder were related at the time he was arrested initially. Specifically, he contends that by the time the police contacted him on November 4, 1991, he had already been identified by the Watsons as the person who shot them, the police had information from Eric Pleasant that he was one of three assailants in the Richardson murder, and bullet and shell casings from the AWIKWA and the Richardson murder matched. The government argues that the police did not interrogate Sweet about the facts in the AWIKWA case and that it did not suspect him in the Richardson case at the time the statements were obtained. The record supports the government's position.

██ Sweet concedes that the Sixth Amendment right to counsel is offense specific and therefore "cannot be considered to be an invocation of the Fifth Amendment right to counsel for all future prosecutions." *See In re A.L.M.*, 631 A.2d 894, 899–900 (D.C.1993) (citing *McNeil v. Wisconsin*, 501 U.S. 171, 177–78, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)). The Sixth Amendment right provides that " 'in all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.' " *McNeil*, 501 U.S. at 175, 111 S.Ct. 2204. Thus, "[i]t can not be invoked for all future prosecutions,

for it does not attach until a prosecution is commenced," that is " 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " *Id.* (quoting *United States v. Gouveia*, 467 U.S. 180, 188, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984)) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (plurality opinion)). Thus, the police can initiate discussion with the defendant about crimes unrelated to the one for which he is in custody. *See A.L.M.*, 631 A.2d at 897 (citations omitted). That is what occurred here. Sweet's right to counsel had attached in the AWIKWA case involving Watson, but no prosecution had been initiated against him in the Richardson case.

 However, Sweet argues that his efforts to obtain a deal in the AWIKWA case in exchange for providing information related to the Richardson murder creates an exception to the "offense-specific" requirement. In *A.L.M.*, we recognized that there may be circumstances where the offense of arrest and an uncharged offense may be so interrelated as to preclude interrogation on the uncharged offense. 631 A.2d at 900; *see also United States v. Martinez*, 972 F.2d 1100 (9th Cir.1992) (exception exists where the pending charge is so inextricably intertwined with the crime under investigation that the right to counsel in the former cannot be isolated from the latter); *United States v. Mitcheltree*, 940 F.2d 1329, 1341 (10th Cir. 1991) (recognizing the exception for a planned and impermissible interference with the right to counsel). We are not persuaded on this record that the factors warranting an exception are present. The record does not show that there was any known relationship between the assault on Marcia Watson and the Richardson mur-

der at the time that the police questioned Sweet. Rather, it appears that the police did not learn of Sweet's involvement in the Richardson crime until after he had testified before the grand jury. There were apparently unrelated victims, who met their fates in different locations. At the time, there was no reason for the government to know of Sweet's involvement in the Richardson murder, particularly while Sweet purported to be able to identify others actually responsible for the crimes. Nor is there evidence that the police engaged in improper conduct in order to circumvent his Sixth Amendment right to counsel.[11] Finally, the police and the prosecutor gave Sweet *Miranda* warnings, and he waived his right to counsel. On this record, there is no showing that the government violated Sweet's Fifth or Sixth Amendment right to counsel.

## V.

Sweet argues that the trial court erred in denying him the opportunity to present certain hearsay statements which exculpated him and showed that someone else committed the offense. Sweet does not challenge on appeal the admissibility of Watson's statements elicited by the government. He contends that once the trial court allowed them in on the issues of identity, Sweet's motive and Marcia Watson's state of mind, it was error not to permit him to present the exculpatory statements she made to others in which she identified someone else as her attacker. Specifically, Sweet contends that the court erred in declining to permit the testimony of Shanora Barnes to the effect that Watson told her that Terry Pleasant shot her. Sweet also complains that the trial court allowed testimony that Watson was afraid of him, but did not allow evidence that she had told her sister that she

---

11. The record discloses no support for Sweet's claim that the government misled him into believing that he was a witness, instead of a target in the Richardson murder, and therefore, his statements should be sup-

pressed. In any event, the right to counsel does not attach simply because an individual is the focus of an investigation. *See Whittlesey v. State*, 340 Md. 30, 665 A.2d 223, 232 (1995).

was afraid of Tony Hammond and fearful because Terry Pleasant was snooping around the hospital after she was shot. The government objected to this evidence on hearsay grounds.

■■■■■ Watson's statements were admissible under various exceptions to the hearsay rule. In this jurisdiction, we have held that a defendant waives his confrontation rights to object to the hearsay statements of a witness when the preponderance of the evidence shows that he procured the witness' silence by murdering him or her. *Devonshire v. United States*, 691 A.2d 165, 168–69 (D.C.), *cert. denied*, 520 U.S. 1247, 117 S.Ct. 1859, 137 L.Ed.2d 1060 (1997) (citations omitted). In *Devonshire* we expressed agreement with the Fifth Circuit's position that:

> [W]hen confrontation becomes impossible due to the actions of the very person who would assert the right, logic dictates that the right has been waived. The law simply cannot countenance a defendant deriving benefits from murdering the chief witness against him. To permit such a subversion of a criminal prosecution "would be contrary to public policy, common sense, and the underlying purpose of the confrontation clause," . . . and make a mockery of the system of justice that the right was designed to protect.

691 A.2d at 168 (quoting *United States v. Thevis*, 665 F.2d 616, 630 (5th Cir.1982)). This rule which provides for the waiver of objection by the party who causes the witness' absence cannot logically "strip the government of its hearsay objections." *United States v. Houlihan*, 92 F.3d 1271 (1st Cir.1996). The waiver is based on the defendant's misconduct in procuring the witness' absence. Under those circumstances, the defendant cannot complain about the admission of the witness' hearsay statements. We agree with the First Circuit that "[i]t is only the party who wrongfully procures a witness' absence who waives the right to object to the adverse party's introduction of the witness' prior out-of-court statements." *Id.* at 1283 (citations omitted).

At trial, the government objected to the admission of Marcia Watson's statements to her sister, Shanora Barnes and Aishah Logan–El. Sweet did not argue at trial or on appeal that Watson's hearsay statements come within any exception to the hearsay rule. Therefore, we reject his argument on this issue.

## VI.

We need address only briefly Sweet's remaining claims. He argues that statements of the severed co-defendants were improperly admitted into evidence. Although he concedes that the court made the requisite inquiry into the unavailability of the witnesses, he contends that the error occurred because the court failed to engage in any fact-intensive inquiry to determine whether the declarations were against penal interest.[12] *See United States v. Hammond*, 681 A.2d 1140 (D.C.1996). In *Hammond*, this court remanded the case to the trial court for a "fact-intensive inquiry" to "determine whether each of the statements, and each of the incriminating references to one or more third parties, was truly self-inculpatory as to the declarant" as required by *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129

---

12. The statements which Sweet challenges on appeal are:
 1) Michelle Watson's testimony that she asked Tony Hammond who really killed the corrections officer when she [gave] conflicting accounts of bragging between appellant and an individual named David Sledge: Tony told her it was appellant and Wright and that he knew appellant would get the job done . . .; 2) Chester Wright's statement to Michelle that he *and* appellant killed the officer as well as details of appellant's involvement . . .; 3) Eric Pleasant's testimony that Terry Pleasant confessed he was driving the van but others did it and 4) that Chester Wright told Eric Pleasant that Terry felt that because appellant and Wright killed the man, they better "take the beef" for it.
 [Appellant's brief, pp. 46–47].

L.Ed.2d 476 (1994). *Id.* at 1146. The government does not dispute that a *Williamson* inquiry is required,[13] and such an inquiry must be conducted at any retrial. The government contends that even assuming that the trial court failed to make an appropriate inquiry, the error was harmless beyond a reasonable doubt. *See United States v. Lang,* 904 F.2d 618 (11th Cir.), *cert. denied,* 498 U.S. 924, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990). In light of our disposition of the case, we need not address the government's harmless error argument.[14]

For the foregoing reasons, we reverse and remand with instructions to vacate Sweet's convictions and for further proceedings consistent with this opinion.

*Reversed and remanded.*

SCHWELB, Associate Judge, concurring.

I concur in the judgment and, with the single *caveat* set forth below, I join the opinion of the court.

Over defense objection, the prosecutor was permitted to introduce into evidence testimony that Marcia Watson made statements to third parties tending to inculpate Sweet. The court sustained objections, however, to exculpatory testimony proffered by the defense to the effect that Ms. Watson identified Terry Pleasant, and not Bradley Sweet, as the shooter. As a result, the jury may have received the impression that Ms. Watson's version of events was consistently inculpatory of Sweet when, if the prospective defense witnesses were to be credited, the contrary would be true. Such an impression may be inaccurate and unfair.

13. The government contends that Sweet's trial counsel never requested the court to conduct a *Williamson* inquiry.

14. We need not address Sweet's claims of merger, some of which the government concedes, since the issue can be addressed adequately, if necessary, after retrial. Sweet also argues that his conviction for assault with intent to kill Edgar Watson with intent to kill

Under these circumstances I do not believe that, on retrial, Sweet should be foreclosed from arguing for the admission of Ms. Watson's alleged exculpatory statements for the purpose of impeaching her inculpatory statements. I do not read the majority's opinion as precluding such a defense contention.

Marcia Watson must be reversed because the indictment alleged a theory of transferred intent for this offense, while the verdict form and the instructions permitted a finding of guilt on a different theory. We need not address this issue because any confusion between the indictment and the verdict form can be and should be avoided on retrial.